VICTORSON v DEPARTMENT OF TREASURY

Docket No. 88975. Argued October 10, 1991 (Calendar No. 14). Decided March 17, 1992.

Richard Victorson brought an action in the Oakland Circuit Court against the Department of Treasury, alleging that a female employee's appointment to an Auditor IX position over him pursuant to the department's 1979 voluntary affirmative action plan was void because the plan had not been approved by the Civil Rights Commission. The court, John N. O'Brien, J., granted partial summary disposition for the plaintiff, finding that the failure to obtain prior approval from the commission rendered the plan void and that implementation and utilization of the plan constituted sex discrimination. The Court of Appeals, BEASLEY and GRIBBS, JJ. (SHEPHERD, P.J., dissenting), affirmed (Docket No. 109225). The department appeals.

In an opinion by Justice MALLETT, joined by Chief Justice CAVANAGH and Justices LEVIN and BOYLE, the Supreme Court *held:*

An employer who implements an affirmative action plan that has not been formally approved by the Civil Rights Commission is not guilty of discrimination as a matter of law. Such conduct is not itself discriminatory. When faced with the existence of an unapproved voluntary affirmative action plan, summary disposition does not automatically follow. Instead, the defendant is to be permitted to show that the plan is otherwise valid as similar in purpose to the Civil Rights Act, that it does not unnecessarily trammel the rights of nonminorities, and that it is temporary in nature.

1. The purpose of the Civil Rights Act, and specifically § 210, is to encourage persons subject to it to take steps voluntarily toward assuring equal opportunity in employment and to be free from charges of discrimination by requiring such plans to be filed with and approved by the Civil Rights Commission

REFERENCES

Am Jur 2d, Job Discrimination §§ 984, 986-991, 996-1002, 1009, 1010.

See the Index to Annotations under Equal Employment Opportunity.

before implementation. By requiring preapproval, the Legislature intended to ensure that the plans do not unnecessarily trammel the rights of nonminority employees.

2. Although § 210 requires preapproval of affirmative action plans, employment decisions made pursuant to unapproved plans do not amount to discrimination, under the act, as a matter of law. The act does not refer to unapproved plans, nor does it indicate the possible consequences for utilizing unapproved plans. Such a narrow construction would negate the purpose of the act and the liberal construction to be afforded remedial legislation.

3. To prove discrimination under the act, a plaintiff first must establish a prima facie case by showing that race or sex has been considered in the employer's employment decision. The requirement may be satisfied by establishing the use of an unapproved affirmative action plan. Thereafter, the defendant may rebut the presumption of discrimination by articulating a nondiscriminatory reason for its employment decisions. The use of an unapproved plan by an employer alone will not entitle the plaintiff to summary disposition.

4. Factors to be considered when determining the validity of an affirmative action plan are whether its purposes are similar to those of the act, whether the employer's plan unnecessarily trammels the rights of nonminorities, and whether the plan is temporary in nature. If the defendant successfully rebuts the plaintiff's prima facie case, the plaintiff may demonstrate that the proffered nondiscriminatory reason is a pretext.

Reversed and remanded.

Justice BRICKLEY, joined by Justices RILEY and GRIFFIN, dissenting, stated that an unapproved affirmative action plan is not a valid plan under § 210 and cannot serve as a legitimate defense to a discrimination claim under the Civil Rights Act. Absent an approved plan, employment action taken to eliminate present effects of past discriminatory practices or to assure equal opportunity with respect to religion, race, color, national origin, or sex, alleged to be discriminatory, must be judged under the provisions of the Civil Rights Act that prohibit unlawful discrimination by employers, as if no affirmative action plan were implemented. Reliance on federal case law in construing a state statute is both inappropriate and misleading when the state statute clearly sets a higher standard for compliance than the analogous federal statute.

The express language of § 210 leaves no doubt regarding the Legislature's intent to allow persons subject to the Civil Rights Act to adopt and implement affirmative action plans only upon approval of the Civil Rights Commission. Because the primary goal of the Civil Rights Act is to eliminate all discrimination,

centralized approval of affirmative action plans is consistent with the overall purpose of the act.

The clear wording of § 210 evidences the Legislature's intent to distinguish between affirmative action plans that are approved and those that are not. An affirmative action plan may be adopted and carried out only if the plan is filed with the commission under rules of the commission and the commission approves the plan. Because there can be no question that approval is mandatory, it follows that failure to comply with the statutory requirement renders the affirmative action plan void. An unapproved plan, although it may be valid under federal civil rights law, is invalid under the Civil Rights Act, not because it is a flawed plan, but because the employer is without authority to promulgate such an unapproved plan. Because § 210 clearly provides authority only to implement an *approved* affirmative action plan, the Legislature could not have intended that an unapproved plan also could be a valid defense to such a claim.

183 Mich App 318; 454 NW2d 256 (1990) reversed.

CIVIL RIGHTS — AFFIRMATIVE ACTION PLANS — CIVIL RIGHTS COMMISSION APPROVAL — DISCRIMINATION.

An employer who implements an affirmative action plan that has not been formally approved by the Civil Rights Commission is not guilty of discrimination as a matter of law, and a plaintiff alleging violation of the Civil Rights Act is not automatically entitled to summary disposition; instead, the defendant is to be permitted to show that the plan is otherwise valid as similar in purpose to the Civil Rights Act, that it does not unnecessarily trammel the rights of nonminorities, and that it is temporary in nature (MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

*Charles J. Porter, P.C.* (by *Charles J. Porter*), for the plaintiff.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Robert L. Willis, Gary P. Gordon, Dianne Rubin, Leo H. Friedman,* and *Deborah A. Devine,* Assistant Attorneys General, for the defendants.

MALLETT, J. We granted leave to determine whether an employer, who implements an affirmative action plan that has not been formally approved by the Civil Rights Commission pursuant to

MCL 37.2210; MSA 3.548(210)[1] is guilty of discrimination as a matter of law. We hold that such conduct is not itself discriminatory.

We therefore reverse the decision of the Court of Appeals and remand to the circuit court for further consideration.

### FACTS

Richard Victorson, a high school graduate, began his employment with the Department of Treasury as an auditor in 1967.[2] In 1982, Victorson took the Professional Managers and Administrators examination on which he received a "highly qualified" rating.[3] This rating made him eligible for any position within the department for which he was qualified. In May of 1983, he applied for a promotion from an Auditor VII to an Auditor IX position available in Ann Arbor, Michigan. Victorson was given a structured oral interview and received the highest score of all applicants interviewed. As a result of both his score on the PMA examination and his oral interview, Victorson was initially recommended for the position.

Ms. Joan Siegla, a Certified Public Accountant and the holder of a master's degree in accounting,

[1] MCL 37.2101 et seq.; MSA 3.548(101) et seq.

[2] In 1976, the Civil Service Commission changed the educational requirement for the auditor class which required a bachelor's degree and either twenty-one semester hours or thirty-two term credits in accounting. Those employed by the department in 1976 who did not have educational requirements were "grandfathered" into the class. "Grandfathered" people stand on equal footing for promotions with those who possess the educational requirement.

[3] Persons taking the PMA examination are graded either highly qualified, which means they score ninety or above, or qualified, which indicates a score of seventy to eighty-nine on the examination. Defendants had an affirmative action program which allowed protected group members in the qualified group to be added to the candidate pool if there were not three candidates in the highly qualified group. The rule of three limits promotions to those in the highly qualified group, provided there are at least three in the highly qualified group.

began her career as an auditor in 1974. Siegla
received a "qualified" rating on the PMA examina-
tion. Initially, Siegla did not apply for the Auditor
IX position because she thought it would require
relocating her residence. After the oral interviews
were completed, Siegla was informed by the De-
partment of Treasury's equal employment opportu-
nity officer that relocation was not necessary.
Siegla indicated she would be interested in the
position and an interview was scheduled. She was
interviewed by Mr. Victorson's interviewers, but
was not given a score. Recommended by the oral
interviewers, Siegla was appointed to the Auditor
IX position over Victorson.[4] Ms. Siegla's promotion
was made pursuant to the Department of Treasury
1979 voluntary affirmative action plan.[5] The 1979

---

[4] Before the 1983 promotion, Victorson had applied for three Audi-
tor IX promotions, all of which went to other men. Subsequent to the
Siegla promotion, Victorson applied for an Auditor X position, which
went to another male, and two Auditor IX positions, which also went
to men.

[5] The 1979 affirmative action plan under which Siegla was ap-
pointed provides:

   The Department of Treasury's statewide goals and progress for
   the 1979 fiscal year are as follows:
       (Handicapped persons are not reflected in the goals because
   guidelines for reporting requirements have not been established
   by M.E.E.O.C.)

   Professional Classes (i.e. Governmental Auditor, Data Systems
   Analysts, Tax Collection Representative and Revenue Ex-
   ecutive) at levels 07 through 11:
       Goals: 8 Females, 9 Blacks, 1 Hispanic and 1 undesignated
   minority
       Hired to date: 5 Females and 7 Blacks

   Technical Classes (i.e. Computer Operator and Computer
   Programmer) at levels 05 through 10:
       Goals: 2 Females, 1 Black
       Hired to date: 2 Females, 1 Black, 1 Hispanic

affirmative action plan under which Siegla was promoted was not approved by the Civil Rights Commission.[6]

Richard Victorson brought suit in the Oakland Circuit Court, alleging among other things that the affirmative action plan under which Siegla was promoted was void because it had not been approved by the Civil Rights Commission.

On cross motions for summary disposition, the circuit court granted partial summary disposition in favor of Victorson. The court found that the department's failure to obtain prior approval from the Civil Rights Commission rendered the plan void. The court further found that implementation and utilization of the affirmative action plan constituted sex discrimination in violation of the Civil Rights Act, MCL 37.2202; MSA 3.548(202), and awarded Victorson more than $14,000 in damages.

Clerical Classes (i.e. General Clerk, Calculations Clerk, Typist, Secretary and Data Coding Machine Operator) at the levels I through VIII:
>    Goals: 15 Blacks, 7 Hispanics
>    Hired to date: 15 Blacks, 5 Hispanics

Professional Classes at levels 12 through 14:
>    Goals: 2 Females, 1 Black
>    Hired to date: 2 Blacks

Technical Classes at levels 11 through 14:
>    Goals: 2 Females, 1 Black
>    Hired to date: None

Administrator Classes at levels 15 through 20:
>    Goals: 1 Female, 1 Black
>    Hired to date: None

---

[6] While the Civil Rights Commission did not approve the 1979 plan, the record indicates that the Equal Employment Opportunity Council did approve the plan. Membership in the council consisted of the Governor, Directors of the Departments of Civil Rights, Management and Budget, and Civil Service, and the Attorney General.

Further proceedings were stayed pending the Department of Treasury's appeal to the Court of Appeals.

The Court of Appeals affirmed the decision of the circuit court. *Victorson v Dep't of Treasury,* 183 Mich App 318; 454 NW2d 256 (1990) (SHEPHERD, J., dissenting), holding that § 210 clearly and unambiguously provides that a voluntary affirmative action plan which has not been approved by the Civil Rights Commission is invalid.

This Court granted leave to appeal by order dated March 22, 1991. 437 Mich 925.

I

We are called upon to determine whether the absence of Civil Rights Commission approval renders employment decisions made pursuant to unapproved voluntary affirmative action plans discriminatory as a matter of law in violation of Michigan's Civil Rights Act.[7] Resolution of this issue will depend upon construction of § 210, which provides:

> A person subject to this article may adopt and carry out a plan to eliminate present effects of past discriminatory practices or assure equal opportunity with respect to religion, race, color, national origin, or sex if the plan is filed with the commission under rules of the commission and the commission approves the plan. [MCL 37.2210; MSA 3.548(210).]

It is a fundamental rule of statutory construction that where the language of a statute is clear and unambiguous, no judicial interpretation is warranted. *City of Livonia v Dep't of Social Ser-*

---

[7] MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*

*vices,* 423 Mich 466, 487; 378 NW2d 402 (1985). However, judicial construction is permitted where the language of a statute is unclear and susceptible to more than one interpretation. *State Treasurer v Wilson,* 423 Mich 138, 144; 377 NW2d 703 (1985). When construing a statute, this Court is obligated to ascertain and give effect to the intention of the Legislature. *Thornton v Allstate Ins Co,* 425 Mich 643; 391 NW2d 320 (1986). Legislative intent may be determined by considering the language and general scope the act seeks to accomplish or the evil it seeks to remedy. *Longstreth v Gensel,* 423 Mich 675; 377 NW2d 804 (1985).

Our courts have come to conflicting conclusions regarding § 210. In *Van Dam v Civil Service Bd of Grand Rapids,* 162 Mich App 135; 412 NW2d 260 (1987), the Court of Appeals addressed the issue whether the Civil Rights Act required submission of affirmative action plans in order for the plan to receive protection under the act. The trial court granted the defendant's motion for summary disposition, finding that MCL 37.2210; MSA 3.548(210) was void of any language indicating the absolute necessity of submitting an affirmative action plan for approval. The Court of Appeals reversed. Finding that the language of § 210 was clear and unambiguous, the Court of Appeals stated that "[o]nly the decision whether or not to initiate an affirmative action plan is discretionary. . . . Clearly, once a plan is initiated, submission of the plan to the commission becomes mandatory." *Van Dam* at 139.

The Court of Appeals came to a contrary conclusion in *Ruppal v Dep't of Treasury,* 163 Mich App 219; 413 NW2d 751 (1987). At issue in *Ruppal* was whether the defendant had been discriminated against on the basis of sex in violation of MCL

37.2202(1)(a); MSA 3.548(202)(1)(a)[8] because the promotion of a female employee was made pursuant to an unapproved affirmative action plan in violation of § 210. The trial court granted the plaintiff's motion for summary judgment. Reversing, the Court of Appeals found that § 210 did require plans to be filed with and approved by the Civil Rights Commission, but held that failure to obtain commission approval does not result in summary disposition in favor of the plaintiff. Citing *J F Cavanaugh & Co v Detroit,* 126 Mich App 627; 337 NW2d 605 (1983), the Court of Appeals opined that an employer's failure to obtain commission approval precludes the employer from invoking the act's protection. These opposite interpretations lead us to conclude that § 210 is at least arguably ambiguous and therefore subject to judicial construction. 2A Sands, Sutherland Statutory Construction (4th ed), § 46.04, p 87.

Originally, § 210 provided that voluntary affirmative action plans could be adopted if the plan was filed with the commission and the commission did not disapprove the plan. HB 4055, § 20. We agree with the Court of Appeals in the present case that the current § 210 contemplates an active role for the commission. We also agree that this active role indicates that the implementation only of approved plans was contemplated by the Legislature.

Similarly, a review of the original and current versions of § 705, which construes the act, further

---

[8] Section 202(1)(a) provides:

An employer shall not . . . [f]ail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.

supports our conclusion that § 210 requires prior approval. Section 705 originally provided:

> Nothing in this act shall be interpreted as restricting the implementation of affirmative action programs to eliminate discrimination and the effects thereof when appropriate. [HB 4055, § 68(2).]

There is no reference to approved plans. The current version of § 705 was slightly modified, and provides:

> This act shall not be interpreted as restricting the implementation of *approved plans,* programs, or services to eliminate discrimination and the effects thereof when appropriate. [MCL 37.2705(2); MSA 3.548(705)(2). Emphasis added.]

We believe that by enacting the Civil Rights Act, specifically § 210, it was the intention of the Legislature to encourage persons subject to the act to voluntarily take steps toward assuring equal opportunity in employment and to be free from charges of discrimination by requiring such plans to be filed with and approved by the Civil Rights Commission before implementation. We also believe that the Legislature, by requiring preapproval, intended to be sure that these plans did not unnecessarily trammel the rights of nonminority employees.

II

Although we find that commission preapproval is required by § 210, we are not persuaded that employment decisions made pursuant to unapproved plans constitute, as a matter of law, discrimination violative of Michigan's Civil Rights Act.

The act does not make reference to unapproved plans, nor does the act indicate the possible consequences for utilizing unapproved affirmative action plans. To assert that the Legislature intended the use of unapproved plans to constitute discrimination as a matter of law is not supported by the legislative history.[9] Such a narrow construction negates the purpose of civil rights legislation and

[9] Our conclusion is supported by a review of the state's long-established policy requiring "equal employment opportunity in state government." In 1971, Governor Milliken issued Executive Directive 1971-8, requiring state agencies and departments to implement the state's policy of providing equal employment opportunity in state employment. The directive was the result of a study conducted by the Civil Rights Commission and the Civil Service Commission, which, among other things, found that women were underrepresented in higher level positions within the Department of Treasury. The directive also made the head of each department and agency responsible for establishing and maintaining affirmative action programs to effectuate the state's policy.

In 1975, Governor Milliken issued Executive Directive 1975-3, establishing the Michigan Equal Employment Opportunity Council. While noting that progress had been made following the issuance of Executive Directive 1971-8, the Governor recognized that more needed to be done to make state governmental positions open to all. The MEEOC, subsequently the Michigan Equal Employment and Business Opportunity Council (MEEBOC), was charged with the responsibility of reviewing affirmative action progress and developing guidelines to assure that the affirmative action plans were consistent with the intent of the directives.

In 1983 and again in 1985, Governor Blanchard affirmed the state's policy of equal employment opportunity and charged the Civil Rights Commission and the Civil Service Commission with the responsibility of prereviewing all state departmental and agency affirmative action plans. See Executive Orders 1983-4 and 1985-2.

We are persuaded that the executive directives issued by Governor Milliken and the executive orders issued by Governor Blanchard recognize two very important principles. First, the issuance of the directives and orders indicates that both Governors realized the state's policy of equal employment opportunity within state government was not being realized. Second, affirmative action was the primary means by which Michigan citizens would realize equal opportunity in state governmental employment. While Executive Order 1983-4 required the Civil Rights Commission and the Civil Service Commission to prereview departmental affirmative action plans, the order is silent regarding whether preapproval was also required. Moreover, the directives and orders demonstrate gubernatorial concern over the dearth of minority and female representation in state employment.

the liberal construction afforded such remedial legislation. *Eide v Kelsey-Hayes Co,* 431 Mich 26, 34; 427 NW2d 488 (1988), citing 3 Sands, Sutherland Statutory Construction (4th ed), § 60.01, p 55.[10]

MCL 37.2202(1); MSA 3.548(202)(1) is Michigan's parallel to title VII, § 703(a), 42 USC 2000e-2.[11] Since Michigan's act is silent regarding the effect noncompliance with § 210 has on alleged discriminatory employment practices, we will look to analogous federal case law as an aid in our construction. *MSEA v Dep't of Management & Budget,* 428 Mich 104, 117; 404 NW2d 606 (1987), citing *Kestenbaum v Michigan State Univ,* 414 Mich 510; 327 NW2d 783 (1982).

In *McDonnell Douglas Corp v Green,* 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), the United States Supreme Court established the order

---

[10] This Court stated the purpose of civil rights legislation in *Miller v C A Muer Corp,* 420 Mich 355, 362-363; 362 NW2d 650 (1984):

Civil rights acts seek to prevent discrimination against a person because of stereotyped impressions about the characteristics of a class to which the person belongs. The Michigan civil rights act is aimed at "the prejudices and biases" borne against persons because of their membership in a certain class, *Boscaglia v Michigan Bell Telephone Co,* 420 Mich 308, 316; 362 NW2d 642 (1984); *Freeman v Kelvinator, Inc,* 469 F Supp 999, 1000 (ED Mich, 1979), and seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases.

[11] It shall be an unlawful employment practice for an emloyer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

of proof in a title VII case. The following include
the steps set forth by the Supreme Court in *Mc-
Donnell Douglas:* First, the plaintiff must establish
a prima facie case of discrimination; then the
burden shifts to the employer to articulate a non-
discriminatory, legitimate reason for its employ-
ment decision. Finally, should the employer suc-
cessfully rebut the plaintiff's prima facie case, the
plaintiff is afforded an opportunity to demonstrate
that the employer's articulated nondiscriminatory
reason is merely pretext. *Id.* at 804. The plaintiff
bears the burden of proving the invalidity of an
affirmative action plan at all times. *Wygant v
Jackson Bd of Ed,* 476 US 267; 106 S Ct 1842; 90 L
Ed 2d 260 (1986).

We believe that the order of proof for title VII
cases established in *McDonnell Douglas* is the
appropriate order of proof for cases arising under
the Civil Rights Act. *MSEA v Dep't of Manage-
ment & Budget, supra.* Thus, under the Civil
Rights Act, the plaintiff must first establish a
prima facie case of discrimination. This will re-
quire a showing that race or sex has been consid-
ered in the employer's employment decision. This
requirement may be satisfied by establishing the
employer's use of an unapproved affirmative action
plan. However, the inquiry does not end here.

After the plaintiff's prima facie case, the defen-
dant is then afforded an opportunity to rebut the
presumption of discrimination. The absence of an
approved plan does not mean that the employer is
precluded from articulating a nondiscriminatory
reason for its employment decisions. Thus, use of
an unapproved plan will not entitle the plaintiff to
succeed on a motion for summary disposition.
Instead, we believe that allowing an employer an
opportunity to demonstrate that the unapproved
affirmative action plan is otherwise valid is consis-

tent with the purpose of the Civil Rights Act[12] and the intention of the Legislature.

The United States Supreme Court articulated several factors to be considered when determining the validity of an affirmative action plan. *United Steelworkers of America v Weber,* 443 US 193; 99 S Ct 2721; 61 L Ed 2d 480 (1979). Those factors include: (1) whether the purposes of the employer's plan is similar to the purposes of title VII, (2) whether the employer's plan unnecessarily trammels the rights of nonminorities, and (3) whether the plan is temporary in nature. *Id.* at 208. At issue in *Weber* was whether a private employer could implement a voluntary affirmative action plan designed to eliminate the racial stratification in its work force. Using the factors listed above, the Court upheld the employer's affirmative action plan which required that fifty percent of the employees selected for the in-plant training program be black.

The United States Supreme Court applied the *Weber* factors to an affirmative action plan implemented by a public employer in *Johnson v Santa Clara Co Transportation Agency,* 480 US 616; 107 S Ct 1442; 94 L Ed 2d 615 (1987). In *Johnson,* the Santa Clara transportation agency adopted and implemented an affirmative action plan designed to eliminate the underutilization of women and minorities. The plan authorized the agency to consider the ethnicity or sex of a qualified applicant seeking a promotion to a traditionally segregated job classification. Petitioner Johnson and a female applicant were considered qualified and were subsequently interviewed. Johnson scored a seventy-five on his interview and was tied for second place. The female applicant ranked third

[12] See n 9 *supra.*

with an interview score of seventy-three. Johnson was ultimately recommended for the promotion, but the female applicant received the promotion because of the agency's affirmative action plan.

The Court used the factors established in *Weber* as a guide in assessing the affirmative action plan utilized by the agency. First, the Court considered whether the agency's plan addressed concerns similar to the concerns addressed by title VII. The Court found that the statistical work force imbalance in traditionally segregated jobs justified the agency's promotion of the female applicant over Johnson.

The next *Weber* factor the Court considered was whether the plan unnecessarily trammeled the rights of male employees. Noting that the agency's affirmative action plan did not set aside any positions for women or minorities, unlike the fifty percent set aside in *Weber,* the Court found that the plan did not trammel the rights of male workers, or create an absolute bar to their advancement. Moreover, the Court was satisfied with the trial testimony of the agency's director that sex was only one of many factors he considered when he decided to offer the promotion to the female applicant.

Finally, the Court found that the agency's plan was temporary in nature because it was designed to eliminate a manifest imbalance in the workplace. Furthermore, the Court found that the plan itself only made reference to attaining a balanced work force and no references to maintaining a balanced work force. Consequently, the Court concluded that the agency's consideration of sex was permissible and its affirmative action plan did not violate title VII.

We believe that fashioning a test similar to that established in *Weber* and used in *Johnson* is an

appropriate means by which to resolve the present and similar cases. Finally, if the defendant successfully rebuts the plaintiff's prima facie case, then the plaintiff is permitted to demonstrate that defendant's proffered nondiscriminatory reason is a pretext.

### CONCLUSION

We reverse the decision of the Court of Appeals and remand the case to the circuit court. We suggest that the circuit court follow the orders of proof outlined above. When faced with the existence of an unapproved voluntary affirmative action plan, summary disposition does not automatically follow. Instead, the defendant is to be afforded an opportunity to show that the plan is otherwise valid. This may be accomplished by showing that (1) the unapproved plan is similar in purpose to the Civil Rights Act, (2) the plan does not unnecessarily trammel the rights of nonminorities, and (3) the plan is temporary in nature.

CAVANAGH, C.J., and LEVIN and BOYLE, JJ., concurred with MALLETT, J.

BRICKLEY, J. (*dissenting*). I agree with the majority that the Legislature intended to encourage persons subject to the Civil Rights Act,[1] through § 210,[2] to voluntarily adopt affirmative action plans. I also agree with the majority's holding that § 210 clearly requires that an affirmative action plan be filed with and approved by the Civil Rights Commission (CRC) in order to be implemented. However, I disagree with the majority's holding that an unapproved affirmative action plan may serve as a defense to a discrimination claim under

---

[1] MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*
[2] MCL 37.2210; MSA 3.548(210).

the Civil Rights Act if the plan would be valid
under federal civil rights law.[3]

I believe the majority misstates the issue in this
case in terms of whether the failure to obtain
approval of an affirmative action plan means that
action taken pursuant to the unapproved plan is
discriminatory as a matter of law. *Ante,* pp 133-
134. The majority holds that such conduct is not
itself discriminatory and that an unapproved affir-
mative action plan may constitute a legitimate,
nondiscriminatory reason for employment action. I
do not find it necessary to decide, as does the
majority, whether the Court of Appeals was cor-
rect in finding that the use of an unapproved plan
is discriminatory per se. Certainly, merely having
a plan does not violate the act, but it is difficult to
envision an action taken pursuant to such a plan
that would not violate the proscription of the Civil
Rights Act against the consideration of religion,
race, color, national origin, or sex. That the Legis-
lature considered there to be a conflict between
those acts prohibited by the statute and actions
taken pursuant to an affirmative action plan is
buttressed by the fact that it found it necessary to
specify the conditions under which "[a] person
subject to this article may adopt and carry out a
plan to eliminate present effects of past discrimi-
natory practices or assure equal opportunity
. . . ." MCL 37.2210; MSA 3.548(210).

Thus, while affirmative action may be *legiti-
mate,* it is seldom ever "nondiscriminatory."
Therefore, the issue that must be addressed is

---

[3] I disagree with the majority's recitation of the facts, implying that
its result is correct because the most qualified applicant received the
promotion in this case. The facts in the record do not support the
conclusion that Ms. Siegla was more qualified than Mr. Victorson.
What the record does reflect, however, is that Ms. Siegla was pro-
moted because she is a woman. The only issue to be resolved is
whether the Department of Treasury had the authority to promote
her on this basis.

whether an unapproved affirmative action plan may constitute a *legitimate* reason for employment action alleged to be discriminatory. I would hold that an unapproved affirmative action plan is not a legitimate defense to a claim under the Civil Rights Act. I further conclude that, absent an approved plan, employment action taken "to eliminate present effects of past discriminatory practices or assure equal opportunity with respect to religion, race, color, national origin, or sex," MCL 37.2210; MSA 3.548(210), that is alleged to be discriminatory, must be judged under the provisions of the Civil Rights Act that prohibit unlawful discrimination by employers, as if no affirmative action plan were implemented.

I

A determination of legislative intent must begin with the statutory language, and if such language is clear and unambiguous, no further judicial interpretation is warranted. *In re Forfeiture of $5,264,* 432 Mich 242, 248; 439 NW2d 246 (1989); *Hiltz v Phil's Quality Market,* 417 Mich 335, 343; 337 NW2d 237 (1983); *Grand Rapids v Crocker,* 219 Mich 178, 182; 189 NW 221 (1922). Further, when the meaning is plainly expressed by the words of a statute, the wisdom of the provision is a matter of legislative responsibility and this Court may not interfere. *City of Lansing v Lansing Twp,* 356 Mich 641, 648; 97 NW2d 804 (1959). Finally, reliance on federal case law in construing a state statute is both inappropriate and misleading when the state statute clearly sets a higher standard for compliance than the analogous federal statute.

Like the majority, I conclude that the express language of § 210 leaves no doubt regarding the Legislature's intent to allow persons subject to the

act to adopt and implement affirmative action plans only upon approval by the CRC. The express language of the statute states that such a plan may be adopted and carried out "*if* the plan is filed with the commission under rules of the commission and the commission *approves* the plan." MCL 37.2210; MSA 3.548(210) (emphasis added). There can be no dispute that "if" was used by the Legislature as a word of condition or contingency. See *People v Merhige,* 212 Mich 601, 610; 180 NW 418 (1920).

While the majority agrees that approval by the CRC is mandatory, it omits any discussion of why an approval requirement is consistent with the purposes of the act. Such a requirement serves to prevent unlawful discrimination and also to encourage persons subject to the act to adopt and carry out affirmative action plans to eliminate the present effects of past discrimination and to assure equal opportunity. The act explicitly prohibits employment actions that are based on immutable characteristics, such as sex. MCL 37.2202; MSA 3.548(202). However, affirmative action plans adopted and carried out pursuant to § 210, by their very nature, involve employment actions that take into account such immutable characteristics.[4] Be-

[4] See *J F Cavanaugh & Co v Detroit,* 126 Mich App 627; 337 NW2d 605 (1983). In *Cavanaugh,* the Court of Appeals noted that the city's requirement that all city contractors implement affirmative action plans "implicitly conflicts with state law which requires employers not to discriminate on the basis of religion, race, color, national origin, or sex." *Id.* at 637. Following a quotation of the wording of § 210, the Court continued:

> In view of the statute's prohibition of discrimination, § 210 implicitly precludes the use of an affirmative action plan unless the plan is "filed with the [civil rights] commission under rules of the commission and the commission approves the plan."

I agree with this conclusion, except that § 210 *explicitly,* rather than implicitly, precludes the use of an unapproved affirmative action plan.

cause the primary goal of the Civil Rights Act is to eliminate all discrimination, it is not surprising that the Legislature has seen fit to centralize in the CRC the approval of affirmative action plans, which by definition require discrete categorization based on sex, race, etc.[5] Thus, centralized approval of affirmative action plans is certainly consistent with the overall purpose of the Civil Rights Act.

Neither does this construction of § 210 interpret it in such a manner as to bar or prohibit affirmative action by a public employer. See *Johnson v Santa Clara Co Transportation Agency,* 480 US 616, 629; 107 S Ct 1442; 94 L Ed 2d 615 (1987); *Baker v Detroit,* 483 F Supp 930 (ED Mich, 1979). Any person subject to the act may implement an affirmative action plan, once that plan has been filed with and approved by the CRC. Even absent an approval requirement like that found in § 210, employers are subject to certain constraints in implementing affirmative action plans. See *ante,* pp 144-145.

These requirements for validity of a plan do not act to prohibit affirmative action measures, but, rather, merely prescribe the manner in which such measures may be implemented. Likewise, while mandatory approval pursuant to § 210 adds another necessary step to the process of adopting and carrying out a plan, it cannot be said to bar or prohibit affirmative action any more than the other undisputed requirements for implementation of a valid affirmative action plan. In fact, an affirmative action plan could assumedly have been

[5] The United States Supreme Court has stated that affirmative action measures, and the elimination of all governmentally imposed discrimination, which is the "core purpose" of the Fourteenth Amendment, are "related constitutional duties [that] are not always harmonious; reconciling them requires public employers to act with *extraordinary care.*" *Wygant v Jackson Bd of Ed,* 476 US 267, 277; 106 S Ct 1842; 90 L Ed 2d 260 (1986) (emphasis added).

validated by the CRC in this case, had it been requested to do so, in far less time and with far less effort than it has taken to secure this Court's pronouncement on the subject.

## II

Under the Civil Rights Act, authority to take a person's sex into account in an employment decision flows *only* from § 210, which clearly allows the adoption and carrying out of an affirmative action plan only upon approval. The clear wording of § 210 evidences the Legislature's intent to distinguish between affirmative action plans that are approved and those that are not. An affirmative action plan may be adopted and carried out "*if* the plan is filed with the commission under rules of the commission and the commission approves the plan." Therefore, a plan may *not* be implemented, *if* it is *not* filed with and *not* approved by the CRC. Because there can be no question that approval is mandatory, it follows, then, that failure to comply with the statutory requirement renders the affirmative action plan void. See *People v Koval,* 371 Mich 453, 459; 124 NW2d 274 (1963). See also *Jones v Municipal Officers Electoral Bd,* 112 Ill App 3d 926, 929-930; 68 Ill Dec 522; 446 NE2d 256 (1983). Therefore, an unapproved plan, though it may be valid under *federal* civil rights law, is invalid under the Civil Rights Act not because it is a flawed plan, but because the employer is *without authority* to promulgate such an unapproved plan.

The importance of, and the *sole reason for,* implementing affirmative action measures pursuant to a *plan* is that the plan, if valid, will serve as a rationale for employment action taken pursuant to it that would otherwise violate the provisions of the Civil Rights Act. As a rationale for the other-

wise discriminatory employment action, the plan is a defense to a discrimination claim. See *Johnson, supra* at 626. Because § 210 clearly only provides authority to implement an *approved* affirmative action plan, the Legislature could not have intended that an unapproved plan could also be a valid defense to such a claim. However, the majority's holding allows an employer to use an unapproved plan as a defense to a discrimination claim under the Civil Rights Act, despite the fact that, under § 210 of the same act, the employer was not permitted to implement the plan in the first· place. Such a construction makes the approval requirement in § 210 meaningless.

### III

Despite the clear and unambiguous wording of § 210, leading to the conclusion that an unapproved affirmative action plan is invalid, and therefore not a legitimate defense to a discrimination claim under the Civil Rights Act, the majority concludes that an unapproved plan may be a legitimate defense as long as the plan would be valid under federal civil rights law.

### A

While conceding that the Civil Rights Act requires an employer to obtain the approval of the CRC before implementing an affirmative action plan, the majority states that the act does not make reference to *un*approved plans, or to the consequences of utilization of an unapproved plan. Therefore, the majority argues, because the act is "silent" on this question, the answer lies in the interpretation of *federal* civil rights law by *other* courts.

The majority correctly points out that the Civil Rights Act does not mention unapproved affirmative action plans, and also does not expressly dictate that an employer may not use an unapproved plan as a defense to a discrimination claim. However, as the majority also concedes, throughout the act the Legislature has made explicit reference to *approved* plans. Moreover, the Legislature altered the language of § 210 to require the CRC to take an active role in the approval of affirmative action plans, thereby rejecting the original wording of § 210 that would have allowed the implementation of a plan as long as the CRC did not disapprove of it. 1975 HB 4055, § 20. A similar change was made to § 705, which originally did not mention approval, 1975 HB 4055, § 68(2), so that § 705 now directs that the act "shall not be interpreted as restricting the implementation of *approved* plans . . . to eliminate discrimination and the effects thereof when appropriate." MCL 37.2705(2); MSA 3.548(705)(2) (emphasis added). In fact, nowhere does the act make reference to a plan intended to "eliminate present effects of past discriminatory practices or assure equal opportunity," MCL 37.2210; MSA 3.548(210), without specifying that such a plan must be *approved.*

While the act does not clearly state the consequences of the implementation of an unapproved plan, the act also does not clearly state that an *approved* plan may be used as a defense to a discrimination claim. Such an explicit statement would be unnecessary because, as explained above, the only reason for implementing affirmative action pursuant to a *plan* is to provide an employer with a defense to a discrimination claim. However, what is unquestionably clear is that § 210 states that an employer *may not implement* a plan with-

out obtaining approval by the CRC. Therefore, to say that the Civil Rights Act is "silent" on the subject of the consequences of failure to obtain approval of a plan is to ignore the explicit wording of § 210 and the logical interpretation that flows from it.

B

The majority also states that prohibiting an employer from using an unapproved affirmative tion plan as a defense to a discrimination claim under the Civil Rights Act "negates the purpose of civil rights legislation and the liberal construction afforded such remedial legislation." *Ante,* pp 141-142.[6] The majority would not, however, argue that the enforcement of any other unquestioned requirement for the validity of an affirmative action plan would "negate" the purpose of the Civil Rights Act. For example, as the majority notes, *id.,* p 144, a plan that is not "temporary in nature" is not a valid plan and therefore cannot be a defense to a discrimination claim. The inability of an employer to use such an invalid plan as a defense to a discrimination claim certainly does not "negate" the purposes of the Civil Rights Act. Likewise, the fact that an employer may only rely on a valid plan, i.e., a plan that was approved by the CRC, is not inconsistent with the purposes of the Civil Rights Act either.

---

[6] The majority also asserts that my construction of the Civil Rights Act is contrary to its legislative history. However, in support of this assertion, the majority does not cite any legislative history, but instead cites several executive directives indicating support for affirmative action. I do not disagree with the majority that through § 210 the Legislature intended to encourage voluntary implementation of affirmative action plans. However, nothing in the executive directives can negate the fact that § 210 encourages voluntary affirmative action only upon *approval* by the CRC.

C

Finally, rather than interpreting § 210 as written, the majority looks to federal case law construing title VII to determine what constitutes a valid affirmative action plan under our Civil Rights Act. By doing so, the majority eliminates almost entirely the effect of the approval requirement in § 210.[7] I have no quarrel with the majority's adoption of the order of proof established by the United States Supreme Court in *McDonnell Douglas Corp v Green,* 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973). However, the order of proof in a title VII case cannot be used to determine what factors affect the validity of a plan under an entirely different act, the Michigan Civil Rights Act. Pursuant to § 210, an employer cannot implement, and therefore cannot use as a defense to a discrimination claim, an affirmative action plan that was not approved by the CRC. Under *McDonnell Douglas,* therefore, such an unapproved plan is not a *legitimate* defense to a discrimination claim under the Civil Rights Act.

Reliance on federal case law interpreting title VII is also inappropriate and misleading because of the obvious differences between title VII and the Civil Rights Act: unlike our act, title VII does not explicitly *permit* voluntary affirmative action. Rather, 42 USC 2000e-2(j) provides only that

Nothing contained in this subchapter shall be interpreted to *require* any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to

---

[7] According to the majority's analysis, the only significance remaining for failure to obtain approval of a plan by the CRC is that the defendant, rather than the plaintiff, has the burden of showing that the plan is valid under the requirements specified by the United States Supreme Court, with regard to title VII.

grant preferential treatment to any individual or
to any group because of the race, color, religion,
sex, or national origin of such individual or
group . . . . [Emphasis added.]

Because of this statutory language, the issue be-
fore the United States Supreme Court in *United
Steelworkers of America v Weber*, 443 US 193; 99
S Ct 2721; 61 L Ed 2d 480 (1979), was whether to
permit voluntary affirmative action at all. In
*Weber*, the Court held that such voluntary affirma-
tive action was permissible because to hold other-
wise would be contrary to the spirit of title VII. *Id.*
at 201-202.[8] The dissenters in *Weber* argued that
the clear and unambiguous language of title VII
precluded any voluntary affirmative action. *Id.* at
216, 220.

Unlike title VII, our Civil Rights Act *explicitly
permits* voluntary affirmative action pursuant to
§ 210, but only *if* an employer obtains the approval
of the CRC. MCL 37.2210; MSA 3.548(210). The
majority certainly does not need to examine the
spirit of the Civil Rights Act to determine whether
it permits affirmative action. Therefore, the issue
before the Court in *Weber* was quite different from
the issue presented here. Though I also do not
quarrel with the majority's adoption of the factors,
established by the United States Supreme Court in
*Weber*, for determining the validity of a plan, the
adoption of those factors by this Court cannot be
at the expense of negating the clear requirement
of § 210 that the use of an affirmative action plan
is contingent on affirmative approval by the CRC.
While a plan may be valid under the *Weber* test,
and therefore a legitimate defense to a title VII
claim, the *Weber* factors alone clearly do not

---

[8] This conclusion was reiterated by the majority with regard to
public employers in *Johnson, supra* at 627-630.

determine the validity of a plan under our Civil Rights Act. Absent approval pursuant to § 210, an employer has no authority to make an employment decision that would otherwise violate the antidiscrimination provisions of the Civil Rights Act. Thus, an unapproved plan is not a valid plan and clearly cannot be a legitimate defense to a discrimination claim under the Civil Rights Act. I would affirm the decision of the Court of Appeals.

RILEY and GRIFFIN, JJ., concurred with BRICKLEY, J.