110 F.3d 64
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Angelo KELLY; Margaret Kelly, Plaintiffs-Appellants,
v.
BASF CORPORATION; Greg Macaroff [sic], Defendants-Appellees.
 No. 95-1851.
 United States Court of Appeals, Sixth Circuit.
 March 25, 1997.
 
 Before: WELLFORD, RYAN, and SILER, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 Plaintiffs, Angelo Kelly and Margaret Kelly, filed this action alleging that the defendants discriminated against Angelo Kelly on the basis of his race, in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich.Comp.Laws Ann. § 37.2101, et seq., and caused Margaret Kelly to suffer a loss of consortium. The district court, sitting in diversity, granted summary judgment in favor of the defendants. We affirm.
 
 I.
 
 2
 In January 1987, BASF Corporation hired Kelly,[1] an African-American, as a chemical operator trainee at BASF's Wyandotte, Michigan, facility. This facility makes products from hazardous chemical materials. The Wyandotte plant has four shifts, A, B, C, and D. Kelly was initially assigned to the B shift. After finishing his training, Kelly began working as a chemical blender, handler, and loader (BH & L). Shortly thereafter, however, he began training for a position as a reactor operator. Kelly was certified as an operator in September 1989 and held that position until he was discharged on November 26, 1991. Kelly did not, however, remain on the B shift throughout his employment. Kelly states that in early 1990, he requested a transfer to the C shift because of racial harassment and discrimination. On May 22, 1990, he was assigned to the C shift. After three or four months on the C shift, Kelly's immediate supervisor, Frederick Stull, Jr., asked Kelly whether he would be interested in a promotion to relief operator. Kelly declined consideration because he did not want to work in the chemical handling area of the plant.
 
 A.
 
 3
 BASF contends that Kelly was discharged on November 26, 1991, for accumulated misconduct and mistakes at work. In support of its contention, BASF has put forth substantial documentation that Kelly's performance was inadequate and, at times, inappropriate and dangerous.
 
 
 4
 In February 1988, BASF placed Kelly on six months' probation for "unacceptable behavior ... that could be construed as sexual harassment." Two other white employees were disciplined in connection with the harassment; one of these employees was discharged and the other was placed on probation for one year. In a letter informing Kelly of his probation, Terry Gallagher, the Wyandotte plant's production manager, warned Kelly that his "behavior and job performance will be under close scrutiny by management in order to come to a final decision on whether to continue [his] employment with the company."
 
 
 5
 BASF prepares annual performance development reviews (PDRs) for its employees. Kelly's PDR for 1988 reported that Kelly "became a fully competent and qualified operator" who "maintained high quality and safety standards in 1988." Kelly was, however, criticized for excessive use of the phone and was asked to improve on his "emergency drill response" time. Kelly's 1989 PDR stated that Kelly "has a good knowledge of # 2 plant operations ... [and] has improve [sic] his response time" for safety drills. However, the report also noted two "incidents" which were attributed to "a lack of attention to details." The report again cited the "negative affect [sic]" of Kelly's personal phone calls and noted that Kelly's "enthusiasm," "positive approach," and "attention to detail" had waned in the latter half of the year.
 
 
 6
 In 1990, Kelly's PDR contained one "unacceptable" rating and several marks below expectations. The report stated that "[d]uring the first part of 1990 Angelo had problems working with the people on his shift" and that he had moved to the C shift with improved teamwork as a goal. The reviewer wrote that prior to Kelly's move to the C shift, his performance "did not come up to the minimum plant standard" and that Kelly had been "counseled on the hazards of sleeping on the job, his lack of attention to detail and lack of motivation in performing routine task[s]." The report noted a "significant positive change in [Kelly's] approach to the job" after his move to the C shift, but still stated that Kelly "needs to improve."
 
 
 7
 In addition to preparing PDRs, BASF also has a policy of preparing an "incident report" when mistakes are made at the plant. According to Gallagher, the reports are used primarily as "training tools" and that, because of the complexity of the equipment and chemical process, the reports are discussed at monthly safety meetings. In July 1991, Richard Prager, the plant's production supervisor, submitted a report to Gallagher detailing Kelly's performance problems. Prager stated that from his experience Kelly had "caused 10 times more incidents than can be considered 'normal' " and that "[t]here is a high probability of a very serious incident being caused by Angelo if he is allowed to continue as a reactor operator." Prager's report listed some 19 incidents, problems, or negative employment actions since 1988, not including Kelly's probation for sexual harassment.
 
 
 8
 Specifically, Prager's report listed at least six work-related mistakes which led to the filing of formal incident reports. Another five work-related incidents which were not formally reported were noted, at least three of which are substantiated by other documents. Of these eleven incidents, Kelly admitted responsibility for four, testified that he does not recall two, and acknowledged that he was held responsible for the other five although he was not really at fault.
 
 
 9
 In addition to these incidents, Prager's July 1991 report to Gallagher noted that on separate occasions Kelly had been "counseled" by management with regard to his overall performance, absenteeism, sleeping on the job, and excessive use of the phone. With regard to sleeping on the job, the record reveals that Kelly was accused of frequently doing so by a coworker, whose story was subsequently corroborated by other coworkers. Finally, the report explained that Kelly had been temporarily reassigned on three different occasions either for retraining or time away from his position as a reactor operator.
 
 
 10
 After considering Prager's report, Gallagher placed Kelly on probation for a six-month period. Gallagher explained to Kelly, by letter, that
 
 
 11
 [y]our performance ... does not meet the minimum standards.... You have caused numerous incidents ... that jeopardize the health and welfare of BASF employee's [sic] and that of the Wyandotte community. The number of safety, environmental, and quality incidents you have caused far exceeds what can be considered acceptable....
 
 
 12
 ... If at any time during this probationary period you are found to be responsible for any incident which affects the success of this plant, your employment with BASF will be terminated.... As always, do not hesitate to seek clarification on any points....
 
 
 13
 Gallagher and Stull reviewed this letter with Kelly.
 
 
 14
 Despite its warning to Kelly that his next mistake would be his last, BASF has documented that Kelly was responsible for three more incidents before he was terminated. In total, then, some 14 incidents were attributed to Kelly, at least nine of which, including the last three, occasioned a formal incident report. Between 1988 and 1991 inclusive, Kelly has identified no more than 60 formal incident reports attributed to other employees on the A, B, C, or D shifts. On the C shift in particular, Kelly documents no more than 16 total incidents attributed to other employees. Kelly candidly admitted that he could not "think of any white employee who was engaged in the degree of mistakes in which [he was] engaged who was not terminated from employment at BASF."
 
 
 15
 Kelly's final incident, a dangerous failure to "bubble check" a new line, was reported to Stull by a maintenance worker. Prior to this final incident, Gallagher visited Kelly on-site to inquire whether BASF could do anything to help Kelly improve his performance. Gallagher also asked Kelly if he would like to be transferred. Kelly reports that he and Gallagher talked for nearly two hours; that he told Gallagher that Stull had made comments about Kelly's race; and that he declined a transfer because he "didn't feel that a shift change would make any difference."
 
 
 16
 According to BASF, the following managers were consulted in the decision whether to fire Kelly; Lorenzo Howard, the plant's human resource manager; David Figg, the plant manager; Prager; Gallagher; and two other senior managers with whom Kelly never had any contact, A.J. Procopio and Deanna Perez. The record reveals that Prager directed a letter requesting permission to discharge Kelly to Gallagher, Howard, and Procopio; all three signed off on Kelly's termination. On November 26, 1991, Prager sent Kelly notice of his termination.
 
 B.
 
 17
 Kelly alleges that he was discriminated against on the basis of his race almost from the moment he began working at BASF. He claims, for example, that after being certified for the BH & L position, he was told the qualifying exam which he had twice failed was "ridiculous and extensive." Kelly concedes, however, that he has no proof that other trainees were not given the same test. Kelly also alleges that, when he was training to become an operator, his mentor, a white employee, did not give him adequate training and would not participate in the unwritten policy of "tak[ing] each other's slack up." Kelly admits, however, that he never asked for help from his mentor; he simply states that he knew the mentor didn't want to work with him because of the mentor's "attitude."
 
 
 18
 Kelly details numerous other problems with coworkers. He alleges generally that he was treated like a "pariah" and that certain coworkers refused to speak to him on the radio used to communicate throughout the plant. He reports that one coworker commented that a room Kelly had just cleaned was "shiny as a nigger seal [sic]." Another coworker, according to Kelly's testimony, suggested that a new computer console should be made "black like Ang[elo]." Kelly acknowledges that this incident was reported to Prager and that Prager informed the coworker that his conduct was inappropriate.
 
 
 19
 Kelly alleges that coworker Greg Makaroff said "racist things," including that Kelly might "snatch[ ] gold chains on holidays." Nevertheless, Kelly states that he and Makaroff "helped each other out," that he "like[s] Gregg [sic]," and that he "still think[s] he's okay." Kelly admits that he told Makaroff that "Farrakhan is in town and he was going to straighten him up" and that he and Makaroff often engaged in sexually explicit "guy talk." Gallagher testified that Makaroff and Kelly were reprimanded after Prager reported that he overheard them "[m]aking racial jokes with each other."
 
 
 20
 In addition to verbal insults, Kelly relates three significant incidents of harassment by coworkers. First, Kelly points to the fact that someone broke into his locker and stole one boot from each of two pairs of boots, forcing Kelly to walk throughout the plant in mismatched boots. When asked whether he reported this incident, Kelly stated that he "made it known that [his] locker had been broken into and that [he] wanted his things back" but that he "never went to anybody" and made a formal report. Kelly admits that when "management" noticed his mismatched boots, he explained his problem and BASF sent him "a slip" to purchase a new pair.
 
 
 21
 Second, Kelly alleges that someone defecated in his respirator. In his deposition, Kelly states that he reported this incident to Stull who immediately provided Kelly with a new respirator. Finally, Kelly alleges that Makaroff donned a "klan mask, hood" made out of napkins and told Kelly that the hood should "keep you from sleeping on the job." When asked whether he reported this incident, Kelly responded:
 
 
 22
 A Yeah, once, after I was terminated.
 
 
 23
 Q Did you ever--
 
 
 24
 A No, twice. Actually it was twice. Once when the incident happened, I told the immediate supervisor, and then once after I was terminated, I called back and complained about it, yeah.
 
 
 25
 Howard stated in his affidavit that Kelly first reported the incident after his termination, that BASF investigated the incident, and that Makaroff was ultimately counseled for his behavior. Howard testified further that Kelly never reported any other racial harassment to the Human Resources Department. Kelly does not contest the fact that Makaroff was eventually disciplined by BASF for the hood incident.
 
 
 26
 When asked in a March 1995 deposition if he "ever [had] any problems with Mr. Stull," Kelly said, "No." However, in the same deposition, he stated that Stull told him "several times" that "Prager did not want [him] to succeed in [his] job." He also explained that Stull "told me, Ang, look, I like you, I don't want to see you get fired, why don't you try to get on another shift, because Prager is going to fire you. I went to Lorenzo Howard and expressed that I wanted to get on another shift...."
 
 
 27
 In an earlier deposition, on December 16, 1994, Kelly was asked "[w]ho [sic] particularly do you accuse of race discrimination?" He answered:
 
 
 28
 A ... I would say Fred Stull. I would say--I would say management, in general.
 
 
 29
 Q Well, who in management....
 
 
 30
 A I've experienced it from Mr. Makaroff.
 
 
 31
 Q And that was at a time when he was a coworker?
 
 
 32
 A Yes.
 
 
 33
 Q Who else do you accuse of race discrimination?
 
 
 34
 A Basically, the other operators that I was working with.
 
 Kelly also testified as follows:
 
 35
 Q What is it, if anything, that Mr. Fred Stull, Junior did to indicate to you that you are the victim of race discrimination?
 
 
 36
 A It was the way and tone and the way that Freddie approached me.
 
 
 37
 Q What did he do or say?
 
 
 38
 A He said to me one night, Angelo, if I was you, I would be in the control room instead of sitting over here talking to Doug. He communicated to me that he implicitly didn't know what it was like to be a black person and worry about losing your job or your family on a day-to-day basis.
 
 
 39
 He harassed me continuously about my employment there. In fact, he told me daily, you know, you are going to be fired. You know, he would walk up and put his arms around me and try to establish the fact that we love you, Ang.
 
 
 40
 He told me on one occasion that after Mr. Wallace Holloway [ (another African-American employee) ] had lost his job, that if he had came to him earlier, he would have been still employed there.
 
 
 41
 In an affidavit filed in opposition to summary judgment, Kelly alleged, for the first time, that Stull had once told Kelly that he "should be glad that [he had] a job because niggers weren't always allowed in Wyandotte."
 
 
 42
 In support of his argument that he was disciplined more harshly than similarly situated white employees, Kelly states that he witnessed a supervisor pass by a sleeping white employee and that the employee was not subsequently disciplined. He also points to the PDRs of a coworker who was not fired or placed on probation, in spite of the fact that he had six "unacceptable" ratings. Finally, Kelly points out that a white coworker failed to bubble check a line not long before Kelly was discharged, and was not even counseled for the incident. Kelly does not dispute, however, that the incident was formally reported and he offers no evidence that the employee had committed other errors.
 
 
 43
 Although complaining about Stull, Kelly states that he "liked" David Figg, the plant manager, and thought that "he was basically a fair guy." Similarly, Kelly reports that he "respected" Gallagher and thought that he was also a "fair guy." With regard to Prager, Kelly states, "I don't think Prager cared for me particularly, and I did what I was told. I don't think that he disliked me or liked me per se. I think he was rather indifferent. He was like in his own little world." Kelly did not know Procopio and has made no allegations of racism against Howard, who is an African-American.
 
 C.
 
 44
 The Kellys' complaint alleged simply that BASF and Makaroff had violated the Elliott-Larsen Civil Rights Act. Finding Makaroff to be "at best a nominal party to this lawsuit," the district court disregarded Makaroff's citizenship for purposes of diversity jurisdiction. The Kellys have not challenged this decision. They have also never put forth any theory under which Makaroff might be liable.
 
 
 45
 After hearing oral argument, the district court granted BASF's motion for summary judgment. On Kelly's "harassment" or hostile environment claim, the district court determined that Kelly had not proffered sufficient evidence to establish that the harassment was "repeated ... on a regular basis and that management tolerated it." On Kelly's claim of disparate treatment, the court found both that Kelly failed to establish a prima facie case and that he failed to submit evidence from which a jury could conclude that BASF's reason for discharging Kelly was pretextual.
 
 II.
 
 46
 We review a grant of summary judgment de novo. Brooks v. American Broadcasting Cos., 932 F.2d 495, 500 (6th Cir.1991). In reviewing summary judgment motions, the court must view the evidence in the light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Under Fed.R.Civ.P. 56(c), summary judgment is proper if all the evidence before the district court " 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to [a] judgment as a matter of law.' " Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th Cir.1988) (quoting Fed.R.Civ.P. 56(c)).
 
 A.
 
 47
 Arguments raised before the district court and not pressed on appeal are considered abandoned. Boyd v. Ford Motor Co., 948 F.2d 283, 284 (6th Cir.1991). Kelly has not argued that the district court erred in granting summary judgment to BASF with regard to his hostile environment claim. This argument has, therefore, been abandoned and we will not consider it.
 
 B.
 
 48
 BASF argues that Kelly's affidavit testimony regarding Stull's comment that "niggers weren't always allowed in Wyandotte" contradicts his earlier deposition testimony that he never had any problems with Stull. BASF argues that we should, therefore, disregard Kelly's affidavit testimony on this issue. It is true that a plaintiff may not create a genuine issue of material fact by submitting an affidavit, in response to a summary judgment motion, which contradicts earlier deposition testimony. See, e.g., Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 315 (6th Cir.1989). Reading Kelly's deposition testimony as a whole, however, we find no substantial contradiction. Accordingly, we consider the comment attributed to Stull in reaching our decision.
 
 C.
 
 49
 In cases arising under the Elliott-Larsen Civil Rights Act, Michigan courts follow the burden-shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Victorson v. Department of Treasury, 482 N.W.2d 685, 690 (Mich.1992). Under that paradigm, once the plaintiff establishes a prima facie case of unlawful discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment action. Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981). If the employer meets its burden of production, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 253. It is not enough to "simply impugn the legitimacy of the asserted justification"; the "plaintiff must also adduce evidence of the employer's discriminatory animus." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir.1994). A plaintiff may demonstrate pretext by showing: (1) that the employer's stated reasons for the adverse employment action have no basis in fact; (2) that the stated reasons were not the actual reasons; or (3) that the stated reasons are insufficient to explain the action. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994).
 
 
 50
 The general rule is "that a statement by an intermediate level management official is not indicative of discrimination when the ultimate decision of discharge is made by an upper level official." McDonald v. Union Camp Corp., 898 F.2d 1155, 1161 (6th Cir.1990). This general rule is not to be applied "formalistic[ally]" or "rigidly." Wells v. New Cherokee Corp., 58 F.3d 233, 238 (6th Cir.1995). Rather, "courts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee." Id.
 
 
 51
 We assume that Kelly has established a prima facie case of disparate treatment, but we are convinced that he has failed to raise a genuine issue of fact on the question of pretext. The most serious incidents of harassment alleged by Kelly involve coworkers. Kelly has not, however, pressed a hostile environment claim before this court. This is not to say that management disregard of racial harassment could not be relevant to a claim of disparate treatment. Rather, with the exception of the dispute as to the incident involving Makaroff's hood, the evidence is that BASF responded appropriately to Kelly's complaints. In any event, even accepting that Stull failed to investigate the hood incident, no reasonable jury could find that "the sheer weight of th[is] circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Manzer, 29 F.3d at 1084.
 
 
 52
 The fundamental shortcoming in Kelly's case is that his only evidence of discriminatory animus flows from Stull. Yet Kelly has no evidence that Stull was "meaningfully involved" in the decision to discharge him. We might accept that Stull was meaningfully involved in this decision if the evidence showed that Stull acted in some way to discriminatorily "cause" Kelly to compile the employment record upon which the decision to terminate him was based. Although Kelly claims that he should not have been found culpable for a number of the incidents attributed to his negligence, he has not provided any basis for a conclusion that BASF's attribution of fault to Kelly differed in any manner from its attribution of fault to other employees. Furthermore, Stull was only responsible for filing a few of the formal incident reports attributing error to Kelly. Finally, of the managers who decided to discharge Kelly, only Prager and Gallagher were mentioned as having any contact with Kelly. Yet, Kelly does not accuse either of them of any discriminatory conduct. To the contrary, Kelly states that Prager was generally indifferent toward him and that Gallagher was a fair guy whom he respected.
 
 
 53
 As Kelly candidly admits, there are no employees, at least none in the record, with employment records similar to his own who were not discharged. We find no factual basis for Kelly's claims, other than his conclusory assertions that he was trained, mentored, or disciplined disparately on the basis of his race. Kelly alleges six specific facts which he argues evidence pretext. Only one, Stull's offer to promote Kelly, merits a response.
 
 
 54
 Accepting that Stull offered to promote Kelly shortly after his transfer to the C shift, the record reveals that Kelly was held responsible for at least nine incidents subsequent to the offer. We conclude that Kelly presented insufficient evidence to permit a jury to find that BASF's explanation of Kelly's discharge was a pretext for discrimination.
 
 
 55
 Kelly's complaint reports several acts of racial hostility which we have accepted as true for purposes of this appeal. However, most of these acts were committed by Kelly's coworkers and none appears to be related in any way to Kelly's discharge.
 
 III.
 
 56
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 We refer to Angelo Kelly as Kelly throughout this opinion