Cynthia HALL, Plaintiff,

v.

STATE FARM INSURANCE CO., James
Roderique, Robert Schmid, and
Mary Lollar, Defendants.

No. 97–CV–71925.

United States District Court,
E.D. Michigan,
Southern Division.

Sept. 24, 1998.

Horace D. Cotton, Detroit, MI, for Plaintiff.

Robert C. Ludolph, Detroit, MI, for Defendants.

### ORDER

JULIAN ABELE COOK, Jr., District Judge.

The Plaintiff, Cynthia Hall, is an African–American female who has charged her former employer, State Farm Insurance Companies (State Farm), and three of her supervisors (Robert Schmid, Mary Lollar, and James Roderique) with wrongful acts of racial and gender discrimination, in violation of Title VII, 42 U.S.C. § 2000e et seq., and the Michigan Elliott–Larsen Civil Rights Act (ELCRA), Mich.Comp.Laws § 37.2101 et seq. She has also brought a claim against these four Defendants for their intentional infliction of emotional distress upon her. As a result of these alleged violations, Hall seeks two million dollars in exemplary and punitive damages, plus costs and attorneys fees.

On March 17, 1998 the Defendants filed a motion for a summary judgment. At the conclusion of the hearing, this Court took the motion under advisement and subsequently issued an Order that (1) granted Hall additional time in which to pursue discovery, and (2) provided each party with an opportunity to file supplemental briefs. Those briefs have now been submitted. In her supplemental brief, Hall asks this Court to (1) deny the Defendants' motion, or (2) continue this matter under advisement pending a decision on her motion to compel the production of certain documents from State Farm. However, the official record in this cause indicates that her motion was denied by Magistrate Judge Marc L. Goldman, to whom it had been referred. Furthermore, it appears that the time for Hall to file her objections to his Order has expired. Consequently, this matter is now ripe for a decision on the merits of the Defendants' summary judgment motion. For the reasons that have been set forth below, the motion is granted in part and denied in part.

### I.

Hall began her employment with State Farm on January 3, 1977. Between 1978 and 1986 she was promoted or laterally moved to several positions within the Personnel Department. During her tenure with State Farm, Hall sought to obtain a promotion to a Personnel Manager position, a process which necessarily involved interviews with the Company persons with promotional authority. Hall asserts that she was informed by a colleague that the interviewers thought of her as nothing more than a black female from the streets of Detroit.[1] As a result, she

---

1. See Pl.Resp.Br.Mot.Summ.J., Ex. 2. Unless otherwise noted, further citations to "Pl.Ex." or "Def.Ex." refer to the exhibits that were attached to Hall's response brief or to the Defendants' brief in support of their motion for a summary judgment, respectively.

became "temporarily devastated" and demoralized at her prospects for promotional opportunities in the Personnel Department,[2] and was extremely disappointed at the end of 1986 when she was moved from her level-MA5 Personnel Representative II position to an MA4 Claims Supervisor position. Although the record shows that she received the same base pay, Hall characterizes this as a demotion because her salary raises were reduced.[3]

In February 1988, Hall was interviewed by Schmid and his supervisor, Robert Conley, both white males, for the position of Bodily Injury (BI) Claims Superintendent and Office Manager, level MA6, in the Madison Heights, Michigan office. This position entailed the responsibility for, among other things, supervising Claim Representatives and the claim files that had been assigned to the unit. Although Hall was selected for the job, State Farm did not offer it to her until December 14, 1988.[4] As a result, she did not receive a pay increase for this promotion until March 18, 1989.[5]

After obtaining the Claims Superintendent position, Hall logged an "Open Door" grievance in February 1993 with David Rost, a white male, who was the Division Manager.[6] In this fourteen-page, single-spaced document, Hall described the difficulties that she had experienced with State Farm as a result of having "broke[n] the 'glass ceiling' for blacks in the Detroit Metro area." She reported that, upon assuming the BI Claims Superintendent position, Schmid blatantly told her that (1) she took the job from more deserving candidates, and (2) he was not in favor of her promotion. According to Hall, he began to openly act out his hostility after Conley left. Among her chief complaints is that Schmid continually tried to force her to switch positions with his friend, Bill Sutton, a white male, who was the Personal Injury Protection (PIP) Claims Superintendent in the Madison Heights office. Although the BI and PIP superintendent positions received the same salary and had the same classification, the latter job was more demanding due to a heavier caseload (277 files compared to 1,080 files, respectively), and came without the authority of Office Manager. Her grievance further documents (1) the uncooperative, rude, and dismissive treatment that she received from Sutton, (2) Schmid's lack of effort in addressing this misbehavior, (3) efforts by Schmid and Sutton to avoid hiring minorities in any units other than BI, despite affirmative action mandates from State Farm, which led to claims by other personnel that Hall was attempting to create an all-minority unit, (4) dismissive treatment from Schmid, such as disregarding her input when designing the space allocation in a new building, (5) Schmid's efforts to undermine her supervision through "purely sexist ... professional sabotage," such as (a) soliciting "Open Door" grievances from employees whom she had reprimanded, (b) criticizing her regardless of the merit of the employee's reprimand, and (c) advising those employees who were still in training that they need not follow her instructions, and (6) Schmid's unjustified characterization of her as being a "hardnosed," "tough," and "mean" administrator.[7]

---

2. Pl.Ex. 2.

3. Pl.Ex. 1.

4. At about this time, Hall filed an "Open Door" grievance with Conley, (Pl.Ex.4), which memorialized her complaints regarding the discriminatory and disparate treatment that she had received at State Farm, beginning with her interview at Corporate Personnel. In this document, she describes the level of her frustration about having to work harder and overcome more obstacles than most of her fellow employees, being silenced, "professionally raped," and humiliated at being forced to spend time at the MA4 level.

5. Pl.Ex. 1. Although this is true, the December 4, 1988 memo which announced her promotion states that its effective date "has not been determined at this time." (Pl.Ex.5.)

6. Pl.Ex. 6.

7. Having received no relief from Schmid's treatment, Hall claims to have sent a copy of her "Open Door" grievance to State Farm Vice President Joyce Soebbing. (Pl.Resp.Br.Mot.Summ.J., at 3.) However, this allegation has not been verified because the second copy of the "Open Door" grievance, which she produced, is addressed again to Rost. (Pl.Ex.8.) She also asserts that, although Rost informed her that Schmid would be removed as her manager, he remained in that capacity until 1994. (Def.Ex. A at 28.)

Hall also complains that in August 1993 State Farm allowed Schmid to force her to involuntarily exchange job duties with Sutton and to relinquish her title as Office Manager. During this period of time, State Farm had asked the Superintendents, who were under Schmid's supervision, to transfer between the BI and PIP units for the purpose of cross-training. Under this plan, the transfers were to last for a period of three years. However, before the end of the three-year period, Sutton was transferred out of the Madison Heights office.[8] Instead of returning Hall to her Madison Heights BI Claims Superintendent and Office Manager position, State Farm moved a white male into that slot in March 1996.[9] Thus, from August 1993 until her termination, Hall worked as a PIP Claims Superintendent in the Madison Heights center.

Schmid acted as Hall's supervisor from January 1989 until June 1994, when Lollar, a white female, served as his successor. Lollar acknowledges that she had conversations with Schmid pertaining to his difficulties with Hall.[10] According to Hall, Lollar maintained a personal desk file (as distinguished from the official Company personnel file), which contained many disparaging documents about her from the preceding three years, in contravention of a Company policy which restricted the retention of such a file for more than one year.[11] Although at least one document demonstrates that Hall was considered by Lollar to be a very good employee,[12] Hall complains that Lollar continually berated the quality of her work in an unprofessional manner.[13] Among Hall's complaints are that Lollar unfairly and improperly criticized her writing to the point of insinuating that she could not write a simple memo without assistance.[14] Hall subsequently received medical treatment for atypical chest pains, which were attributed to tension and stress, and thereafter took a one week disability leave.[15]

When Lollar left the Madison Heights office in June 1996, she was replaced by Roderique, a white male. Hall complains that Lollar perpetuated a cycle of discrimination by providing Roderique with her personal desk file.[16] During this general time period, Hall was fielding customer complaints regarding a Claims Representative named Patricia Sebenick, a white female.[17] On August 23, 1996 Hall sent Roderique a memo, in which she voiced some of her concerns about Sebenick.[18] Roderique testified at a deposition that he told Hall the memo "contained a lot of BS." [19]

On Friday, September 20, 1996 at 5:00 p.m. Roderique met with Sebenick, and two other white employees (Jeff Gabriel and Kim Smith), all of whom expressed their frustration at the treatment that they were receiving from Hall, and the hostile environment that had been created by her.[20] On the following Monday morning, Roderique called Hall into his office to inform her of the complaints and issue a verbal warning.[21] Roderique acknowledges that (1) he did not

---

**8.** Hall provides no extrinsic evidence in support of this factual allegation.

**9.** Pl.Ex. 9.

**10.** Pl.Ex. 10.

**11.** Pl.Ex. 11, 12, 13.

**12.** Pl.Ex. 15.

**13.** Pl.Ex. 16.

**14.** Pl.Ex. 49.

**15.** Pl.Ex. 49.

**16.** Pl.Exs. 11; 17 at 95.

**17.** Pl.Ex. 19. This exhibit contains four writings concerning customer service problems relating to Sebenick. The first and second are memos from Hall to Sebenick, dated September 6 and 9, 1996. The third is an attorney demand letter dated September 5, 1996. The fourth, dated February 2, 1995, is from a customer who was also a State Farm employee, and details rude and impertinent remarks that she attributed to Sebenick.

**18.** Pl.Ex. 19.

**19.** Pl.Ex. 20 at 114.

**20.** Pl.Ex. 21 at 40–42. Hall claims this was a State Farm meeting, although it occurred off-premises, and complains that they violated Company policy by consuming alcohol. (Pl.Br. at 5.)

**21.** Pl.Ex. 21 at 42–44.

make an attempt to speak to anyone else in the unit to investigate or verify the complaints prior to his meeting with Hall,[22] and (2) none of the African–American adjusters complained about Hall.[23]

On September 27, 1996 Hall prepared an eleven-page, single-spaced "Open Door" grievance against Roderique and faxed it to Rost on September 30, 1996.[24] This grievance, which recounts numerous incidents in the unit involving Sebenick, complains of a racially hostile environment that had been created by Roderique whom she contends turned their disagreements into a race issue by consulting only with non-minorities and ignoring the African Americans in her PIP unit. Hall explains that she was upset at Roderique for joining a "clique" of employees to take a critical stance against her despite having served as her supervisor for only about three months. It should be noted that Hall neither mentions or alleges sex discrimination in her grievance.

On the following day, Roderique criticized the timeliness of Hall's reports.[25] Although this criticism was oral, Roderique issued his first written disciplinary memo to her on October 1, 1996.[26] Roderique followed this by issuing two other written disciplinary memos against Hall on October 10, 1996 and October 28, 1996. All three of these memos addressed Hall's alleged problem with untimely reports as well as errors in them.[27]

Hall contacted Rost to request relief from Roderique's allegedly retaliatory behavior. In early October 1996, Rost, believing that the matters in Hall's department had become serious, asked the Human Resources Department to conduct an investigation in accordance with State Farm policy.[28] Rost assigned Tony Dean, an African–American male who was employed as a State Farm Human Resources Specialist, to evaluate the situation.[29] Dean obtained the assistance of another Human Resources Representative, Darryl Gilliam, also an African–American male, in conducting the investigation.[30]

Their investigation involved interviewing all but one of the State Farm employees who had been supervised by Hall and Roderique in the PIP unit.[31] These employees consisted of four African–American females, three Caucasian females, one African–American male, and one Caucasian male.[32] Additional employees were also interviewed as a result of referrals. Those in the PIP unit who were not interviewed were one Caucasian female employee, who was out of the office during Dean's two-week investigation, and one Caucasian male employee, who was on limited tenure.[33]

In his investigative report, Dean concluded that "[t]he concerns expressed by Superintendent Hall regarding DCS Roderique were inconclusive," but that it was "evident that there is conflict and/or hostility between Superintendent Hall and DCS Roderique."[34] The report acknowledged a unanimous feeling among the employees within the PIP unit that they "did not perceive racial discrimination of any form," and concluded that "it appears that DCS Roderique was following performance management actions when bringing performance issues to Superintendent Hall's attention."[35] It also noted that a "tremendous amount of tension" existed in Hall's PIP unit, with a majority of employees feeling that they would be targeted by Hall if any of them had questioned her actions.

---

22. Pl.Ex. 22 at 85.

23. Pl.Ex. 22 at 83.

24. Pl.Ex. 23; Def.Ex. A at 130.

25. Def.Ex. A at 129–30.

26. Pl.Ex. 24.

27. Pl.Ex. 24.

28. Def.Ex. C at 36.

29. Def.Ex. C at 35–36.

30. Def.Ex. C at 37.

31. Pl.Ex. 25.

32. Pl.Ex. 25.

33. Pl.Ex. 25.

34. Pl.Ex. 25 at 5.

35. Pl.Ex. 25 at 4, 5.

During the investigation Sebenick reported her concern regarding the possibility of file altering by Hall, a matter which was brought to upper management's attention for further investigation. As a result of this "new development," and even though Dean's report states that "[e]ach employee was asked questions that specifically related to the allegations made by Superintendent Hall," Hall alleges that Dean and his partner did not investigate her complaint against Roderique but rather sought to solicit information from Madison Heights employees in an obvious effort to build a case against her. The Defendants dispute this charge, claiming that, concurrent with Dean's investigation, State Farm was conducting a regularly scheduled review of PIP files, known as a "PIP blitz," including those handled in Hall's unit. Lollar coordinated the PIP review, during which she was approached by Gabriel and Sebenick. They expressed concerns about Hall's handling of claim files, including her instruction to Sebenick to change a request for payment authority on a claim file for Michael Morgan (Morgan file) from more than $300,000 to only $49,000.[36] This file contained Hall's handwritten note, in which she purportedly instructed Sebenick to request a payment of $49,422 rather than the $318,000 that was actually paid by the Company. After Sebenick allegedly refused to comply with this directive, Hall placed a handwritten note in the file instructing her secretary, Margaret Love, to make the changes. Lollar forwarded this information to Roderique and Rost's supervisor, Mark Odland, State Farm Vice President of Operations.

Hall objects to the Defendants' representations regarding the Morgan file, contending that they have deliberately misstated the facts. Hall asserts that Claims Representative Mary Ann Buono, who was responsible for paying bills in the Morgan file, did so without proper authority. After Buono was transferred, Sebenick assumed responsibility for the file and continued making payments without Hall's authority. When Sebenick discovered that no authority had been obtained for the payments, she brought the matter to Hall's attention. According to Hall, to get a correct accounting on the file, she asked Sebenick to total all of the bills that had been made on the file. Sebenick refused to do. Because the bills were mounting in the file, Hall manually totaled the drafts that Sebenick had paid and arrived at the $49,422.39 figure. As Hall explains it, because the Morgan file was of an unusual variety that is not maintained on a computer network accessible by claims personnel, at least a two-week delay was inherent in obtaining an accurate total of the amount paid by Buono. As a consequence, Hall submitted a request to Lollar for additional authority with which to satisfy State Farm's obligation, noting that the payments on the Morgan file had already exceeded its authorized limitation.[37] Lollar subsequently granted payment authority of $200,000, and, upon receiving the Claim Committee report, obtained additional monies in the sum of $638,000 in payment authority.[38] Lollar testified at deposition that she did not recall anything unusual about the Morgan file or any conversations that she had with Hall about it.[39] Thus, she has not disputed Hall's version of events.

Roderique also conducted a review of the PIP files from Hall's unit and found documents that he considered to have been altered in the John Ferguson claim file (Ferguson file). He reported this information to Rost, who in turn conveyed Roderique's observations to Odland. Interestingly, Roderique testified at a deposition that (1) being "over authority" was not a problem which was unique to Hall, and (2) such files are usually discovered by State Farm during a semi-annual audit, as evidenced by the PIP blitz. Hall points out that Roderique testified that he merely believed that the documents had been altered, but was unable to

---

36. As a Claims Superintendent, Hall had authority to approve payments up to $50,000. However, she had to obtain additional authority from her Divisional Superintendent (Schmid, Lollar, or Roderique) for any payments above that amount.

37. Def.Ex. A at 97–104, 114; Def.Ex. H.

38. Pl.Ex. 40.

39. Pl.Ex. 41.

provide any facts to support his belief.[40]

On the basis of the array of accusations, the Company decided to have a team of Divisional Claim Superintendents review more than two hundred of Hall's claim files. This review was not part of any regularly scheduled audit, and neither Schmid, Lollar, nor Roderique took part in it. Rost felt that the review raised concerns about Hall's performance, primarily from a group of over thirty files which "involved issues of file authority not being apparently up to date or proper in the files or something along the lines of that—where there's indication that there might have been less management involvement than there should have been, a variety of reasons."[41] He shared these findings with Odland, who decided to call in Regional Audit Consultant Ralph Weber, of the Audit Department, to investigate the files in Hall's PIP unit. Hall was then placed on administrative leave on November 4, 1996. Two days later she filed a race discrimination charge with the Equal Employment Opportunity Commission (EEOC).

As a result of his investigation, Weber concluded that Hall had improperly handled the Morgan and Ferguson files.[42] Additionally, two employees, Michelle Meulebrouck and Erika Jhons, had informed him that Hall had previously instructed them to make false Claim Activity Log entries which would incorrectly indicate that the issues had been addressed in a timely manner.

Weber also discovered that Hall had authorized fifteen hours of overtime payments for a mail and file clerk, Tracey Walker, and for Love, although Hall knew that they had worked only seven and one half hours. This authorization violated State Farm policy. Love did not accept this overtime pay, believing that it would have been improper to do so. On the other hand, Walker, apparently not sharing Love's sentiments, accepted the overtime pay, which was made possible by Hall who contacted her supervisor and represented that the hours had been worked. Hall also wrote the supervisor "I told her we'd probably let her take one day of comp and pay her the other hours in overtime. If you'd rather handle it another way, please let me know. Thank you."[43]

Hall contests Weber's conclusions on the overtime pay issue, on several grounds. First, Hall asserts that she had the managerial discretion to compensate Walker who worked from Sunday evening to midnight in preparation for the PIP blitz.[44] Second, Hall explains that she (1) compensated Walker for the actual 7.5 hours worked, (2) only recommended that Walker receive a day off in compensatory time without pay, and (3) never authorized Walker's receipt of 15 hours in overtime pay.

In his report, Weber indicated that he had been informed by Love that Hall may have used State Farm funds to pay Shamrock Investigations (Shamrock), a State Farm vendor, $2,300 to do surveillance work for personal reasons. The issue was raised when Love was unable to match a Shamrock invoice to a related claim number. According to Love, it was brought to the attention of Hall who took the invoice and announced that it she would take care of it. The State Farm investigation into the Shamrock matter had not been completed when Hall was terminated.[45] State Farm also alleges that Hall received legal assistance from a State Farm law firm vendor for personal reasons, paying for costs but not attorneys fees. State Farm characterizes these instances as having violated its policy against acceptance of business gifts or other favors. Hall (1) contends that

40. Pl.Ex. 38 at 108–09.

41. Def.Ex. C at 58.

42. For example, Weber concludes "In sum, Subject's explanations regarding [the Morgan] file were not persuasive." (Def.Ex. H, Dec. 2, 1996 Report, at 2.)

43. Def.Ex. K.

44. Pl.Ex. 42.

45. Ultimately, State Farm confirmed that (1) Hall had asked Shamrock to conduct surveillance of her boyfriend, Donald Davis, and (2) she provided a purported State Farm claim number for this work. (Def.Ex. L [Affidavit of Richard Murphy, Shamrock President].) Shamrock completed the assignment, submitted a written report to Hall at the Madison Heights center, and subsequently received a check from State Farm in payment for its services. (Id.)

any such policy was ever implemented, (2) asserts that she paid whatever the lawyer billed, and (3) denies that she obtained the lawyer's services with the intent of not paying for the attorney's time.

Based upon these findings, State Farm terminated Hall's employment on December 3, 1996. The Defendants assert that another reason for Hall's termination was that during the PIP blitz approximately thirty-eight files assigned to her unit could not be found. In her defense, Hall maintains that (1) the maintenance of storage files was not within her job duties, and (2) Roderique acknowledged that twenty-nine of these files were subsequently found. Moreover, she points to a basic unfairness in the process by claiming that (1) the request to pull files should have been directed to the Madison Heights mail and records unit, (2) a list of over 1,378 requested files was received by her on the Friday immediately preceding the PIP blitz, which was scheduled to begin on the following Monday, and (3) she lacked access to any files in dead storage.

Finally, the Defendants assert that Hall's backlog in collecting nearly one million dollars in claims on behalf of State Farm from the Michigan Catastrophic Claims Association (MCCA) also supported her termination. Hall contests this assertion on the basis that significant lags in seeking reimbursement from the MCCA were a common deficiency throughout State Farm. It is her contention that State Farm's performance in seeking reimbursement from the MCCA was so much poorer than its competitors that the deficiency was brought to Odland's attention along with the suggestion that the collection procedure be reviewed.[46]

## II.

Federal Rule of Civil Procedure 56 governs summary judgment motions. Subsection 56(c) provides, in part, that:

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 250, 106 S.Ct. 2505.

In assessing a summary judgment motion, the court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the non-moving party. Fed. R.Civ.P. 56(c); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991), *cert. denied,* 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984). It is not the court's role to weigh the facts. *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435–36 (6th Cir.1987). Rather, the judge's responsibility is to determine "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

When a summary judgment motion is predicated on a factual issue and is adequately supported, the non-moving party must take affirmative action to avoid entry of summary judgment.

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

46. Pl.Ex. 47.

Fed.R.Civ.P. 56(e). The mere existence of a scintilla of supporting evidence is insufficient. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). Additionally, a party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" mandates the entry of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

If this Court feels that a genuine issue of material fact exists as to a particular claim, or that the moving party is not entitled to judgment as a matter of law on a particular claim, it may deny summary judgment on that claim even while granting partial summary judgment on any remaining claims.

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing on the motion ... shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy and what material facts are actually and in good faith controverted.

Fed.R.Civ.P. 56(d). Thus, each individual claim must be analyzed under the summary judgment standard.

## III.

Defendants Schmid, Lollar, and Roderique argue that a summary judgment must be granted in their favor because individual lia-

bility may not be imposed against them under either Title VII or ELCRA. As explained below, the Court concludes that this assertion is correct as to Title VII, but incorrect as to ELCRA.

## A.

▇ Title VII provides that "it shall be an unlawful employment practice for an employer" to discriminate on the basis of race or sex. 42 U.S.C. § 2000e–2(a). Under Title VII an "employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees ... and any agent of such person." 42 U.S.C. § 2000e(b). "Agent" is not defined in Title VII but has been characterized as "an individual who 'serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994) (quoting *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir .1993)).

In *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir.1997), the Sixth Circuit Court of Appeals (Sixth Circuit) joined the majority of its sister circuits in holding that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." [47] It found this holding warranted because the statutory scheme and remedial provisions in Title VII, as well as "the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of

---

47. *See also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir .1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"); *Williams v. Banning*, 72 F.3d 552, 554–55 (7th Cir.1995) ("a supervisor does not, in his individual capacity, fall within Title VII's definition of employer"); *Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.), *cert. denied*, 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995) (Title VII does not impose individual liability on supervisory employees); *Smith v. Lomax*, 45 F.3d 402, 403 (11th Cir.1995) (employees cannot be held liable under the ADEA or Title VII); *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.1994) (Title VII does not permit imposition of liability upon an individual unless Title VII's definition of employer is

satisfied); *Miller v. Maxwell's Int'l Inc.*, 991 F.2d 583, 588 (9th Cir.1993) (individuals cannot be held liable for damages under Title VII and ADEA); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993) (under Title VII, suits must proceed against individuals in their official capacities only; individual capacity suits are inappropriate); *see Lenhardt v. Basic Institute of Technology, Inc.*, 55 F.3d 377, 381 (8th Cir. 1995). The Sixth Circuit found it proper to rely upon case law that addressed Title VII, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, and the American with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12117, because the liability schemes within these three Acts are similar for purposes of employer/employee liability. *Wathen*, 115 F.3d at 404 n. 6.

'employer' it selected for Title VII." [48] *Wathen,* 115 F.3d at 405–06. As a consequence, the Sixth Circuit upheld the granting of a summary judgment motion in favor of three supervisors who worked for the defendant, General Electric Co., in what it characterized as "upper-level management" positions. *Wathen,* 115 F.3d at 402, 406.

 Hall argues that Schmid, Lollar, and Roderique fall within the Title VII exception which allows individual liability when that person qualifies as an "employer." Courts considering this exception have written "[a]n individual qualifies as an 'employer' under Title VII if he or she serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *Paroline v. Unisys Corp.,* 879 F.2d 100, 104 (4th Cir.1989), *aff'd in pertinent part,* 900 F.2d 27 (4th Cir.1990) (en banc); *Sauers,* 1 F.3d at 1125. This definition allows for individual liability when the defendant "operates as the alter ego of the employer." *Sauers,* 1 F.3d at 1125.

Hall argues that all of the supervisors at State Farm meet this definition because they continually exercised "significant control" over those employees under their supervision. In support of this position, she cites the deposition testimony of Odland who stated that the Company supervisors initially make termination recommendations to the Human Resources department.[49] A review of Title VII case law does not support such an expanded interpretation. To the contrary, courts have been disinclined from finding individual liability under Title VII. For example, the *Sauers* Court held that an individual qualifies as an "employer" for Title VII purposes if he or she (1) serves in a supervisory position, and has (2) "significant control over plaintiff's hiring, firing, or conditions of employment," and (3) "the ultimate authority over [the plaintiffs] employment and working conditions." *Sauers,* 1 F.3d at 1125; *accord Harvey v. Blake,* 913 F.2d 226, 227 (5th Cir.1990) (immediate supervisors are "employers" within meaning of Title VII when they are delegated traditional employer rights such as hiring and firing). Although *Sauers* found that the supervisor-defendant in that case was a "paradigm example" of someone who met this standard, it nonetheless ruled that he could only be sued in his "official capacity" and thus the suit against him "operated" as one against the municipality which employed him. *Sauers,* 1 F.3d at 1125. The Tenth Circuit Court of Appeals also opined that "[u]nder Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate." *Id.*

This result is consistent with the tide of decisions which disallow individual liability under Title VII. At a minimum, federal decisions interpret Title VII as requiring at least actual and direct control over employment conditions and status before liability may be imposed. Odland's testimony establishes that State Farm supervisors do not have that level of control. Even though (1) Roderique may have recommended Hall's termination if she admitted to altering the Morgan or Ferguson file,[50] or (2) Schmid may have had some level of influence over Hall's promotion to the BI Claim Superintendent position and her transfer to the PIP unit, these facts do not adversely affect the ultimate conclusion that they, along with Lollar, lacked any authority to unilaterally terminate Hall's State Farm employment. Thus, Schmid, Lollar, and Roderique are granted a summary judgment on Hall's federal race and sex discrimi-

---

**48.** The rationale used by courts in reaching this conclusion was articulated in 1995 by the Eighth Circuit Court of Appeals as follows:

[t]he consensus of these courts is that Title VII actions brought against individual employees are against those employees in their "official" capacities, and that liability can be imposed only upon the common employer of the plaintiff and of the individual fellow employees who are named as defendants. Under this view, the language "any agent of such a person" is de-signed to incorporate the principles of respondeat superior into Title VII rather than to expose either supervisors or co-workers to personal liability in employment discrimination cases.

*Lenhardt,* 55 F.3d at 380.

**49.** Pl.Ex. 32.

**50.** *See* Pl.Ex. 33.

nation claims because they may not be held individually liable under Title VII.[51]

### B.

■ ELCRA declares that the right to obtain employment in the absence of race or sex discrimination is recognized and declared to be a civil right. Mich.Comp.Laws § 37.2102(1). It prohibits these practices by the same mechanism as is used in Title VII; namely, by making it unlawful for an "employer" to discriminate on the basis of race or sex. Mich.Comp.Laws § 37.2202(1). Agents are also included within ELCRA's statutory definition of "employer." Mich. Comp.Laws § 37.2201(a). Defendants Schmid, Lollar, and Roderique argue that they should be granted a summary judgment on Hall's ELCRA race and sex discrimination claims because this language, when analyzed in the context of recent case law, prohibits them from being held liable under ELCRA in their individual capacities.

Disposition of Hall's ELCRA claim is controlled by *Jenkins v. American Red Cross*, 141 Mich.App. 785, 369 N.W.2d 223 (1985). In that case, the plaintiff brought an ELCRA race discrimination claim against his former employer and two of its employees who served in supervisory roles over him. *Id.* at 789–91, 369 N.W.2d 223. The trial court denied the individual defendants' motion for a directed verdict, which was premised on the assertion that they were not "employers" within the meaning of ELCRA. *Id.* at 799, 369 N.W.2d 223. The Michigan Court of Appeals affirmed, holding that the inclusion of "agent" within the statutory definition of "employer" authorized individual liability under ELCRA.

Defendants next contend that the trial court erred in failing to dismiss individual defendants Johnson and Shafer. We do not agree. An employer is defined in the Elliott–Larsen Civil Rights Act as a person who has one or more employees, and it includes an agent of that person. M.C.L. § 37.2201(a); M.S.A. § 3.548(201)(a). *Defendants Johnson and Shafer moved for a directed verdict on the ground that they were not employers within the meaning of § 201(a).* The trial court denied the motions, relying on *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich., 1977).

We find that *Munford* controls and that the trial court properly denied the motions for a directed verdict. The *Munford* court construed Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b), which defines an employer as one who has 15 or more employees and includes any agent of such a person. *The court held that if a person has responsibility for making personnel decisions for the company, he is an agent within the statutory definition of an employer, at least for that purpose. Munford, supra, at 466. We find that under Munford, defendants Shaffer and Johnson were responsible for making personnel decisions affecting plaintiff, and were agents within the meaning of § 201(a).*

*Jenkins,* 141 Mich.App. at 799–800, 369 N.W.2d 223 (emphasis added).

In the case at bar, the Defendants argue that *Jenkins* would be decided differently today by the Michigan courts and thus is not controlling. In support of this argument, the Defendants point out that the reasoning in *Munford* has recently been implicitly rejected by *Wathen.* While this is true, it does not follow that *Wathen,* rather than *Jenkins,* should control the result on Hall's ELCRA claim.

*Jenkins* has not been overruled or even criticized by any subsequent Michigan Court of Appeals or Michigan Supreme Court case.

---

**51.** In her brief, Hall requests permission to amend her Complaint for the purpose of adding David Rost as a defendant if the Court finds that individual liability will not lie against Schmid, Lollar, or Roderique. This request is denied. First, such a request must be submitted to the Court in the form of a properly presented motion. *See* E.D.Mich. LR 7.1. Second, in every corporation, some person or entity will have to be responsible for making an employee termi- nation decision. Allowing liability to be imposed upon an employee on the basis of the grounds that have been advanced by Hall in support of this request would (1) render illusory Title VII's proscription against individual liability, and (2) be particularly inappropriate because, in the corporate context, a termination decision might be made by a person who is totally removed from the allegedly discriminatory environment.

Moreover, numerous decisions, which are also currently good law, have held that individual liability is available under ELCRA. *Lawrence v. Electronic Data Systems*, 1994 WL 762217 at *4 (E.D.Mich.1994); *Yedla v. Electronic Data Sys.*, 764 F.Supp. 90, 91 (E.D.Mich.1991); *Ball v. Martin Marietta Magnesia Specialties, Inc.*, 130 F.R.D. 77, 81 (W.D.Mich.1990); *Kelly v. Drake Beam Morin, Inc.*, 695 F.Supp. 354, 356 (E.D.Mich. 1988).

It might be argued that the validity of these decisions is subject to doubt given that all of them, with the exception of *Yelda*, rely upon *Jenkins*, which the Defendants argue has been implicitly abandoned in Michigan as the result of the decision in *Meagher v. Wayne State Univ.*, 222 Mich.App. 700, 565 N.W.2d 401 (1997). In *Meagher*, the plaintiff brought an ELCRA age discrimination claim pursuant to Mich.Comp.Laws § 37.2101 et seq., naming Wayne State University and four individuals as defendants. *Meagher*, 222 Mich.App. at 706, 565 N.W.2d 401. On appeal, and as emphasized by the Defendants, the Michigan Court of Appeals stated:

> [f]urther, plaintiff has not shown clear error with respect to the trial court's finding that the claim *against three of the individual defendants* was devoid of arguable legal merit. *Specifically, plaintiff has not shown any factual or legal basis for filing a claim against these defendants for age discrimination in their individual or agency capacities. The mere fact that [ELCRA,] M.C.L. § 37.2201(a); M.S.A. § 3.548(201)(a) defines "employer" as including an agent does not automatically authorize a claim against an agent.* M.C.L. § 37.2202; M.S.A. § 3.548(202) defines the prohibited acts of the "employer." *It is one thing for an employee to file a claim against an employing entity (here, the university) under agency principles for the individual or collective acts of its agents that give rise to an inference of discriminatory practices or acts, it is quite another thing for an employee to file*

*a claim against a particular agent for prohibited acts.*

*Id.* at 728, 565 N.W.2d 401 (emphasis added) (citation omitted).

However, despite the Defendants' contention, it is far from clear that Michigan courts will now refute individual liability under ELCRA or abandon *Jenkins*.[52] Significantly, *Meagher* did not even mention or cite to *Jenkins*, and there is no basis to believe that the *Meagher* court even considered it. Additionally, the *Meagher* holding can be distinguished because it was not, contrary to the Defendants' representations, based on the frivolity of asserting individual liability under ELCRA. Instead, it was founded on the absence of any evidence whatsoever that three of the individual defendants participated in discriminatory conduct.

> In the present case, plaintiff's presumptive approach to age discrimination focused on [only one defendant's] alleged discriminatory conduct in discharging the plaintiff on the basis of the plaintiffs age. *We do not find that plaintiff has cited any basis for filing claims against the other three individual defendants for [the one defendant's] alleged discriminatory conduct,* even if there was some involvement in the matter (e.g., a post-termination request for an investigation of the reasons for the discharge) and one considers the critical time . . . of when the case was commenced.

*Meagher*, 222 Mich.App. at 728–29, 565 N.W.2d 401 (emphasis added) (citation omitted).

■ Moreover, although Defendants accurately state that *Jenkins* found the now discredited *Munford* decision to have been controlling, *Jenkins*, 141 Mich.App. at 799, 369 N.W.2d 223, an inspection of *Jenkins* finds that *Munford* was not the only basis for its decision. After discussing *Munford*, the Michigan Court of Appeals wrote "[t]his Court has examined defendants' attempts to distinguish *Munford* and *policy arguments against application of Munford* in the present case, and finds them to be without mer-

---

52. *See Mills v. Electronic Data System, Inc.*, 986 F.Supp. 437, 439 (E.D.Mich.1997) (in considering claim that individual defendant was fraudulently joined in ELCRA age discrimination case,

Court writes "it is not at all clear to this Court that the Michigan Courts would rule, as a matter of law, that there can be no individual liability under Elliott–Larsen").

it." *Jenkins,* 141 Mich.App. at 800, 369 N.W.2d 223 (emphasis added). Importantly, strong reasons do support a finding that individual liability is available under ELCRA even though it may not be asserted under Title VII. Therefore, the Defendants' argument that *Wathen* should control, rather than *Munford* and by extension *Jenkins,* must also be rejected.

In many respects the employer liability provisions of Title VII and ELCRA are substantively identical. Moreover, it cannot be said that the plain language of these two statutes plainly prohibit individual liability. To the contrary, the language which includes "agents" as being equivalent to "employers" seems to authorize individual liability, since by operation of law employees are agents of the employer. It is precisely this reasoning upon which the *Munford* and *Yelda* courts ruled that individual liability was available in Title VII and ELCRA, respectively. *Munford,* 441 F.Supp. at 465; *Yedla,* 764 F.Supp. at 91.

■ In the context of Title VII, this result has been discredited principally based on the rule of statutory construction which requires a statute to be interpreted as a whole. For example, employer liability under Title VII is limited to those entities with fifteen or more employees. 42 U.S.C. § 2000e(b). Under those circumstances, the imposition of individual liability appears to be incongruent with Congress' intent because the liability limitation under Title VII was designed in part to avoid burdening small entities with the costs of litigating discrimination claims. So too, it would be "inconceivable" for a Congress that is ostensibly concerned about the stimulation and maintenance of small businesses to simultaneously allow the imposition of individual liability. *Wathen,* 115 F.3d at 406. Individual liability is also inconsistent with Title VII's remedy provision, which provides only for equitable relief or back pay, remedies that are available only from the employer. 42 U.S.C. § 2000e–5(g); *Wathen,* 115 F.3d at 406. Even the 1991 Civil Rights Act, which authorized awards of compensatory or punitive damages in Title VII cases, continues to evidence that only employer liability is authorized because damages are calibrated by size of employer. 42 U.S.C. § 1981a(b)(3)); *Wathen,* 115 F.3d at 406. "[I]f Congress had envisioned individual liability ... it would have included individuals in this litany of [calibrated] limitations and would have discontinued the exemption for small employers." *Wathen,* 115 F.3d at 406 (internal quotation and citations omitted).

However, the rules of statutory construction raise no such conflict in the context of ELCRA. For example, ELCRA covers any employer "who has 1 or more employees." Mich.Comp.Laws § 37.2201(a). Thus, ELCRA undeniably envisions placing liability on individuals, such as two-member business entities where one person is the principal and the other person serves as the employee. Moreover, ELCRA's remedy provision authorizes "person[s] alleging a violation of this act [to] bring a civil action for appropriate injunctive relief or damages, or both," with "damages" being awarded for an "injury or loss caused by each violation of this act, including reasonable attorney's fees." Mich. Comp.Laws §§ 37.2801(1), (3). These ELCRA remedies further distinguish it from Title VII because damages can be obtained from individuals as well as employers.

As a result, the individual Defendants' effort to obtain a summary judgment on the basis that individual liability is unavailable under ELCRA is denied.

## IV.

■ The Defendants contend that a summary judgment must be granted as to Hall's sex discrimination claims under Title VII and ELCRA because of her alleged failure to exhaust all available administrative remedies when she omitted this allegation from her EEOC discrimination charge. The Court agrees, and in addition concludes that Hall has failed to produce any evidence from which a trier of fact could reasonably find that she was discriminated against because of her sex.

Hall filed an EEOC charge on November 6, 1996 in which she alleges only "race-based employment discrimination" and retaliatory

conduct by her employer.[53] In a post-termination charge that Hall filed with the EEOC on February 4, 1997, she alleged only retaliatory discharge.[54] Both charges omit any mention of sex discrimination, and identify only State Farm as the respondent. The premise which underlies the Defendants' challenges to these deficiencies is the well-settled principle that Hall must exhaust her administrative remedies under Title VII in order to validly bring a judicial action. 42 U.S.C. § 2000e–5(f)(1).

In the Sixth Circuit, the Title VII complaint in a judicial proceeding "is only limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Tipler v. E.I. duPont de-Nemours & Co.*, 443 F.2d 125, 131 (6th Cir. 1971); *EEOC v. Bailey Co.*, 563 F.2d 439, 446 (6th Cir.1977).[55] In *Bailey Co.* the Sixth Circuit refused to allow the EEOC to maintain a claim of religious discrimination where the EEOC charge had complained only of sex and race discrimination, holding that religious discrimination could not reasonably be said to grow out of the charge filed. *Bailey Co.*, 563 F.2d at 445, 447. Similarly, the absence of any mention or even inference of sex discrimination in Hall's EEOC charge leads to the conclusion that the gender issue does not reasonably grow out of her racial discrimination charge.

This case is distinguishable from *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970), in which the complainant initially filed an EEOC charge of sex discrimination, later amended to include allegations of race and national origin discrimination. *Id.* at 458–59. The EEOC investigation uncovered evidence which revealed that the employer had discriminated against the complainant on the basis of her national origin. *Id.* at 459. Sanchez then instituted a judicial action alleging race and national origin discrimination. *Id.* The trial court granted the employer's application for dispositive relief,

concluding that (1) only Sanchez's initial sex discrimination charge was timely, and (2) her judicial claims were beyond the scope of that charge. *Id.* at 460. The Fifth Circuit Court of Appeals reversed, reasoning that the facts alleged in Sanchez's EEOC charges were sufficient to trigger an EEOC investigation and that her subsequent legal claim of national origin employment discrimination was a natural outgrowth of the sex discrimination charge because any other result would have penalized the woman, a lay person, for not attaching the correct legal conclusion to her experience. *Id.* at 462–67.

■ By contrast, Hall has failed to assert any basis upon which this Court can discern that sex discrimination played a role in the treatment that she received. Moreover, she has not identified any comments or situations from which even an inference of gender bias could be reasonably drawn. The only mention of that issue in this extensive record is found in one sentence of a grievance memo that she submitted, in which she complains that Schmid had subjected her to "purely sexist ... professional sabotage."[56] Such a conclusory allegation is insufficient and an inadequate basis upon which to premise a claim of sex discrimination. Therefore, her Title VII and ELCRA sex discrimination claim must be dismissed on the Defendants' summary judgment motion.

## V.

Next, the Defendants submit that they must be granted a summary judgment on the merits of Hall's Title VII and ELCRA claims because (1) Hall has not produced any evidence which would establish that she was treated differently from similarly situated State Farm employees, and (2) she has failed to provide the Court with any evidence that the reasons that they offered for her termination were merely pretextual. These arguments must be rejected. Therefore, the De-

---

**53.** Def.Ex. O.

**54.** Def.Ex. P.

**55.** The Sixth Circuit has identified two reasons for the adoption of this rule: (1) it permits an effective functioning of Title VII given that persons filing charges are not trained legal techni-

cians, and (2) an ultimate civil action is more intimately related to the EEOC investigation of the charge than it is to the words used in the charge. *Bailey Co.*, 563 F.2d at 446–47.

**56.** Pl.Ex. 6 at 6.

fendants' motion for a summary judgment as to Hall's race discrimination claims under Title VII and ELCRA must be denied.

## A.

■ The United States Supreme Court has established a burden-shifting analysis for Title VII employment discrimination cases, which was first described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and was later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Generally, discrimination claims under ELCRA are evaluated in the same manner as Title VII claims, and consequently they will be treated as one for the purposes of this discussion. *See Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1311–12 (6th Cir.1989); *Lytle v. Malady*, 458 Mich. 153, 579 N.W.2d 906, 914–15 & n. 19 (1998); *Victorson v. Department of Treasury*, 439 Mich. 131, 143, 482 N.W.2d 685 (1992); *McCalla v. Ellis*, 180 Mich.App. 372, 377–78, 446 N.W.2d 904 (1989), *appeal denied*, 434 Mich. 893 (1990).

Under this analysis, a plaintiff bears the initial burden of production, which requires that she establish a prima facie case of race discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992). When the plaintiff has only circumstantial evidence of discrimination, a prima facie case can be established by showing that:

(1) she was a member of a protected class; and,

(2) for the same or similar conduct was treated differently than a similarly-situated non-protected person.

*Mitchell*, 964 F.2d at 582–83. These factors, however, are sufficiently flexible to account for the differing factual situations that can arise in Title VII cases. *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817; *Lytle*, 579 N.W.2d at 914 n. 19.

A plaintiff who has established a prima facie case has created a rebuttable presumption of actionable discrimination, and if the defendant employer remains silent the court must enter judgment for the plaintiff since no issue of fact remains. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. Thus, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [its] rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Clark v. Uniroyal Corp.*, 119 Mich.App. 820, 824, 327 N.W.2d 372 (1982).

> The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted....

*Burdine*, 450 U.S. at 254–56, 101 S.Ct. 1089.

If the defendant's burden of production is met, the *McDonnell Douglas* presumptions become irrelevant, because "having fulfilled its role of forcing the defendant to come forward with some response," the presumption "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510–11, 113 S.Ct. 2742; *Burdine*, 450 U.S. at 254–55, 101 S.Ct. 1089. This result is required because "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. At this point, the next analytical step is to "to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [her]' because of [her] race." *St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742 (citation omitted). One manner in which that question can be answered was described by the Supreme Court.

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the ele-

ments of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, "[n]o additional proof of discrimination is required."

*St. Mary's Honor Ctr.*, 509 U.S. at 511, 113 S.Ct. 2742.

### B.

■ Reviewing the parties' respective arguments on this issue, as well as the evidence in support thereof, leads the Court to conclude that (1) Hall has established a prima facie case of race discrimination, and (2) the Defendants have successfully rebutted the presumption of discrimination by articulating non-discriminatory reasons for her discharge. However, Hall has presented sufficient evidence from which a trier of fact could reasonably conclude that she was subjected to intentional acts of racial discrimination by the Defendants.

■ In an effort to establish her prima facie case, Hall identifies three other State Farm employees who also occupied the position of Claims Superintendent: (1) William Rees, a white male, (2) Jackie Johnson, a white female, and (3) Dennis Pattock, a white male. The Defendants contend that these individuals are not similarly situated to Hall, and are thus inappropriate to the relevant Title VII and ELCRA analysis, because none of them engaged in (1) deliberate acts of misconduct that were designed to conceal irregularities in the claim files under their supervision, or (2) conduct which demonstrated a lack of honesty or trustworthiness. However, the Defendants have attempted to define the relevant comparison too narrowly. Hall need only identify other similarly situated non-minority employees who engaged in misconduct of comparable seriousness. *See Mitchell*, 964 F.2d at 582–83 & n. 5; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283, 96 S.Ct. 2574, 49 L.Ed.2d 493 n. 11 (1976) (precise equivalence in culpability not required). This mandate does not require Hall to identify misconduct of an identical quality, as the Defendants argue.

The Defendants do not challenge Hall's assertion that these three individuals were similarly situated to her. Indeed, such a claim does not appear to be available since all of them were, like Hall, Claims Superintendents working for State Farm. Rather, the narrow issue upon which the parties disagree is whether these three persons engaged in substantially similar misconduct as that alleged against Hall. The Defendants answer this question in the negative, contending that Hall affirmatively engaged in misconduct whereas the three other individuals only suffered from performance deficiencies. But this distinction is disingenuous. As recognized by the Defendants, Rees engaged in "inappropriate behavior" and subsequently made numerous inappropriate or sexually-oriented comments.[57] State Farm was concerned enough about this behavior to require Rees to attend a sexual harassment seminar on two occasions. Contrary to the Defendants' argument, Rees' behavior clearly falls within any reasonable working definition of "misconduct," and was comparable in seriousness to Hall's alleged misconduct. Yet, unlike Hall who was terminated, (1) Rees was transferred to another unit, (2) written documentation regarding the misconduct was placed in his personnel file, (3) he was required to seek professional counseling with a six-month follow-up report to State Farm, and (4) his supervisor was changed. Moreover, Hall has proffered presumptively innocent explanations for her alleged misconduct. Hence, her explanations must be given credence while the instant motion is being assessed unless they are so incredible that no reasonable trier of fact could accept them. Under that rubric, Rees' misconduct was unquestionably more egregious than the misconduct which the Defendants have attributed to Hall. Thus, Hall has established a prima facie case and raised a rebuttable inference of race discrimination.

■ The Defendants have rebutted the presumption of discrimination by articulating nondiscriminatory reasons for her discharge; to wit, Hall (1) misrepresented facts, or di-

---

57. Pl. Supplemental Br.Mot.Summ.J., Ex. A.

rected subordinates to alter documents in an effort to conceal that she had exceeded her authority on two State Farm claims files, (2) deliberately authorized payments to two employees, which neither of them were entitled to receive, in violation of State Farm policy, and (3) had possibly violated an existing State Farm conflict of interest policy by engaging State Farm vendors to perform personal services that may have been improperly billed to, and paid by, State Farm.

Thus, the issue is whether Hall has produced sufficient evidence from which a reasonable trier of fact could conclude that she was subjected to intentional acts of racial discrimination by the Defendants. In the judgment of this Court, and when viewing the evidence according to the standards of review of dispositive motions, Hall has met her burden of production. The Defendants have identified two claim files (Morgan and Ferguson) that were allegedly mismanaged by Hall. In a rebuttal to these accusations, Hall has provided the Court with an extensive explanation in support of her position.[58] In order to grant their motion for a summary judgment, the Court would have to agree with the Defendants that her explanations are improbable.

However, if her representations are accepted as true, as is required on the Defendants' dispositive motion, the circumstances surrounding Hall's discharge could arguably be sufficient for a trier of fact to conclude that (1) the Morgan file was used as a pretext to support Hall's discharge, and (2) the Defendants intentionally discriminated against her because of race. Those circumstances are that:

(1) Hall may have experienced racially discriminatory treatment in 1986 during her corporate interviews for a Personnel Manager position, about which she makes allegations that the Defendants have not rebutted;[59]

(2) numerous performance reviews between 1994 and 1996, and prior to her September 27, 1996 "Open Door" grievance which led to the investigation that resulted in her dismissal, were very favorable to Hall and made no significant criticisms of her,[60] and State Farm has failed to counter this point with any allegation that Hall ever received poor performance evaluations prior to that time;

(3) the first written critical evaluation of her performance was issued on October 1, 1996 by Roderique shortly after the filing of her September 27 grievance against him, and was followed by two more written critiques during the same month, which suggests that retaliation may have been the real motive for them;

(4) although State Farm claims that the alleged file mismanagement was independently uncovered by the PIP blitz and ensuing intensive file review, the timing suggests that the investigation was initiated as a result of Hall's grievance, which suggests that retaliation for her race discrimination claims was the true reason for her discharge;

(5) notes that appear to have resulted from Dean's investigation indicate that Love heard that some employees had planned to "complain and collude" against Hall;[61] and,

(6) Roderique, the subject of Hall's race discrimination grievance, appears to have had some involvement in the decision to terminate her.[62]

In addition, the Defendants do not dispute that (1) Schmid and Sutton strived to main-

---

**58.** See supra at 757–58.

**59.** The Defendants challenge the relevancy of this allegation on the basis that it is barred by the applicable three year statute of limitations. (Def. Reply Br.Mot.Summ.J., at 4 n. 8.) Thus, they contend that Hall can avoid this limitations period only by arguing that it was tolled by the "continuing violation doctrine," which she has failed to assert. (Id.) To the contrary, Hall's Complaint specifically alleges continuous discrimination throughout the course of her employment at State Farm, an allegation that she restates in her brief. (Compl. ¶¶ 13–15; Pl. Reps.Br.Mot.Summ.J., at 1.)

**60.** See Pl.Ex. 15.

**61.** Pl.Ex. 48.

**62.** Pl.Ex. 33, 35.

tain Caucasian workplaces, (2) minorities were concentrated in Hall's unit, (3) Roderique met with three white employees, all of whom complained about Hall, or (4) shortly after this meeting, Roderique issued a verbal warning to her despite not having attempted to speak with anyone else in her unit about the allegations, and even though no African–American employees had registered any complaint about her.

■ The Defendants' other articulated reasons for Hall's discharge are insufficient to support the entry of a summary judgment against her. The only other allegation of file mismanagement that Defendants have brought to the attention of the Court pertains to the Ferguson file. However, Roderique has acknowledged that his allegation of improprieties by Hall regarding the Ferguson file were based merely upon his personal beliefs and were not supported by any facts or evidence.[63] Since the Defendants have not addressed whether any actual improprieties were confirmed with respect to the Ferguson file before Hall was terminated, an adequate basis exists for considering these allegations by State Farm to have been a pretext.

■ Similarly, Hall's alleged use of State Farm vendors for her own personal matters cannot validly be considered as supporting her discharge. The Defendants allege that Hall improperly used two State Farm vendors, an attorney and a private investigator, for personal matters. With regard to the attorney, Hall, who has denied having obtained his services with an intention of not paying for his time, acknowledges that she only paid for the filing of the complaint.[64] As for the private investigator, Hall maintains that she never received a bill for his services and, as such, acknowledges that she never paid for his services. Without assessing the credibility of Hall's explanations, it appears that State Farm had no knowledge of Hall's use of the attorney before it terminated

her.[65] Moreover, it acknowledges that its inquiry regarding Hall's use of a private investigator had not been completed when her employment was terminated. Thus, the Company, with its investigation still in progress, only had suspicions of Hall's impropriety as of the date of her involuntarily departure from its employment. Hence, these are two issues that State Farm cannot assert as being the bases for Hall discharge from employment.

This leaves State Farm's allegations regarding Hall's (1) alleged improper authorization of overtime compensation for seven-and-one-half hours that two employees did not work, and (2) failure to obtain reimbursement from the MCCA in a timely manner. Even if this Court accepted these technical improprieties as sufficiently supporting Hall's termination, a question exists regarding whether a similarly situated Claims Superintendent would be fired for comparable irregularities, especially considering (1) State Farm's failure to dispute Hall's allegation that Schmid, Lollar, and Roderique maintained a desk file on her, in technical violation of an existing State Farm policy, but for which they were apparently not disciplined, and (2) Odland's acknowledgment that backlogs in requesting MCCA reimbursement were common within State Farm. A similar situation exists with regard to State Farm's claim that Hall's discharge was supported by the inability to locate approximately thirty eight files during the PIP blitz because Hall has adequately rebutted the substance of this criticism.[66]

Hall's experiences at State Farm, and the circumstances under which her employment was terminated, could lead to the inference that (1) the Company's stated reasons for her discharge were pretextual, and (2) she was subjected to acts of discrimination because of her race. Consequently, the Court must deny the Defendants' motion for summary

**63.** Pl.Ex. 38 at 108–09.

**64.** Def.Ex. A at 210.

**65.** For example, the reasons proffered as supporting Hall's discharge were outlined in the investigative report of Auditor Weber.

(Def.Ex.H.) Although the report extensively discusses Hall's use of State Farm private investigator vendors for personal matters, it contains absolutely no reference to her use of attorney vendors.

**66.** *See supra* at 758–59.

judgment on her race discrimination claims under Title VII and ELCRA, especially because there are genuine issues of material fact that are ill-suited to a summary judgment. *See Smith v. Hudson,* 600 F.2d 60, 66 (6th Cir.1979).

## VI.

 Finally, the Court will grant a summary judgment in favor the Defendants in connection with Hall's intentional infliction of emotional distress claim because she has offered no evidence to support the elements of this tort. To establish this claim, Hall must show:

(1) extreme and outrageous conduct;

(2) intent or recklessness;

(3) causation; and,

(4) severe emotional distress.

*Roberts v. Auto–Owners Ins. Co.,* 422 Mich. 594, 602, 374 N.W.2d 905 (1985). The first factor can be demonstrated " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* at 602–03, 374 N.W.2d 905 (quoting Restatement (Second) of Torts § 46 cmt. d, at 73 (1965)).

Even assuming that Hall's evidence of a hospital admission for chest pain, which was attributed to tension and stress and led to a one-week disability leave, shows that she suffered severe emotional distress, she is unable to establish extreme and outrageous conduct as that element is defined in *Roberts.* Hall has not shown any conduct by State Farm which crosses the line of "utter intolerab[ility]," especially considering that the applicable factors erect a "strict standard for establishing the tort." *Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 777 (6th Cir.1996). Moreover, the broad contours of the allegations that Hall makes are substantively indistinguishable from those alleged in *Hartleip,* an employment discrimination case in which the Sixth Circuit concluded that the challenged conduct was not sufficiently outrageous and did not support a claim of intentional infliction of emotional distress under Michigan law. *Id.*

## VII.

Accordingly, for the reasons that have been explained above, the Court will grant the Defendants' motion for a summary judgment on Hall's (1) Title VII claims of race discrimination against Schmid, Lollar, and Roderique, (2) Title VII and ELCRA sex discrimination claims, and (3) intentional infliction of emotional distress claims. However, their motion is denied in all other respects, such as to Hall's (1) Title VII and ELCRA race discrimination claim against State Farm, and (2) ELCRA race discrimination claim as to the individual Defendants.

IT IS SO ORDERED.